Richmond

VANDRA COLLINGSWORTH OEHL

V.

BARRY DONALD OEHL

November 26, 1980.

Record No. 781397.

Present: All the Justices.

*Leonard S. Sattler* (*Bray and Sattler,* on briefs), for appellant.
*Bernard S. Cohen* (*Cohen, Vitt & Annand,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

This appeal poses the question whether a Virginia trial court erred in failing to grant comity to an order of an English court.

Barry Donald Oehl and Vandra Collingsworth Oehl, both English subjects, were married in London in 1963. Two children were born of the marriage, one in August 1968 and the other in April 1970. On October 4, 1970, Mr. Oehl deserted his wife and children. An English magistrate granted custody of the infants to Mrs. Oehl, awarded Mr. Oehl "reasonable access to the children", and ordered Mr. Oehl to make monthly child support payments.

In 1973, Mr. Oehl, who had moved to Virginia, filed suit in the court below seeking a no-fault divorce from his wife, who had remained with the children in England. Mrs. Oehl filed a cross-bill for divorce on the ground of desertion. By decree entered October 7, 1974, the chancellor granted Mr. Oehl a no-fault divorce, awarded "complete custody and control" of the children to Mrs. Oehl, "subject to reasonable rights of visitation" by Mr. Oehl, and ordered Mr. Oehl to pay $30 per month for spousal support and $120 per month for child support.

In January 1976, responding to a rule to show cause why he was $2100 in arrears in support payments, Mr. Oehl petitioned the chancellor to reduce the support awards and to enforce his rights of visitation by compelling Mrs. Oehl to send the children to the United States. Arrearages continued to accumulate, and in February 1977, the chancellor released the liens on Mr. Oehl's Virginia real estate and ordered that the net receipts from the sale of the property be placed in escrow to insure payment of $3790 due to Mrs. Oehl. Mr. Oehl then renewed his motion to compel visitation privileges in the United States. Although no order was entered of record, the parties agree that the chancellor verbally granted Mr. Oehl's motion at a hearing in May 1977.

In July 1977, Mrs. Oehl filed an application in the High Court of Justice in England (hereinafter, the English court) requesting that the children be declared wards of that court and that the court provide "directions" concerning Mr. Oehl's rights of visitation. An "originating summons" was issued, and Mr. Oehl acknowledged receipt of process and stated his position in a letter dated August 9, 1977.

Shortly thereafter, Mr. Oehl filed a motion in the court below seeking a rule against Mrs. Oehl to show cause why she had not complied

with the verbal order announced in May. At a hearing on this rule, both parties submitted draft orders, but neither was entered and the cause was continued.

Meanwhile, the English court received evidence in support of the application filed by Mrs. Oehl. Included were numerous letters and affidavits filed by the children's neighbors, their maternal and paternal grandparents, and their teachers. The evidence indicated that the children, who were formerly well-adjusted, had recently begun to exhibit behavioral symptoms of emotional stress, including weeping, bed-wetting, nightmares, aggressive conduct, and scholastic regression. A physician called to treat one of the children diagnosed his symptoms as "solely attributable to anxiety over the possibility of his leaving to go to live in the United States and leave his mother."

In consideration of this evidence, the English court entered an order on February 27, 1978 (hereinafter, the English order) finding that "the welfare of the children would not be served by them visiting America to stay with a father and his wife both of whom are unknown persons to them." Based upon this finding, the English order declared the children "Wards of this Court" and provided that Mr. Oehl's "access to the said minors [be] limited to access in England under the supervision of an acceptable party".

Mrs. Oehl then petitioned the court below to amend its verbal order to conform with the terms of the English order. The chancellor proceeded to hear evidence on this motion and Mr. Oehl's pending motion to compel compliance with the verbal order. Testifying at the hearing, Mr. Oehl acknowledged that, although he had returned to England on one or more visits, he had not seen the children since he left his wife shortly after the second child was born.

The order challenged by Mrs. Oehl on appeal was entered June 30, 1978. Finding that Mr. Oehl "is entitled to reasonable Stateside rights of visitation", the chancellor granted Mr. Oehl "rights of visitation in the United States . . . during the thirty-one (31) days of each July hereafter"; required Mr. Oehl to "bear all costs of . . . round-trip transportation" of the children; and provided that "in the event [Mrs. Oehl] disobeys this Court's rulings with respect to [Mr. Oehl's] aforesaid rights of visitation, . . . child support, maintenance and alimony payments heretofore ordered shall ipso facto be suspended until such time as this Court has been satisfied that [Mrs. Oehl] is no longer in non-compliance with this Order."

The crucial issue raised by Mrs. Oehl's appeal is whether the chancellor erred in failing to grant comity to the February 27, 1978 order

of the English court modifying the visitation clause of the child custody order entered in the court below on October 7, 1974. We begin our analysis by examining the relevance of the full faith and credit clause, U.S. Const., art. IV, § 1, as applied to child custody orders entered by the states of the union.

■ Since a child custody order is not *res judicata* in the forum state, it is not necessarily entitled to full faith and credit in the courts of other states. *Ford* v. *Ford,* 371 U.S. 187, 192 (1962); *Kovacs* v. *Brewer,* 356 U.S. 604, 607 (1958); *New York ex rel. Halvey* v. *Halvey,* 330 U.S. 610, 615-16 (1947). This is because the initial order is inherently transitory, subject always to modification for just cause by courts of competent jurisdiction. A modification order enjoys a presumption of validity and should be accorded full faith and credit until the presumption is overcome or until changed conditions justify further modification.

While the full faith and credit doctrine is not literally applicable to this case, it is conceptually analogous to the doctrine of comity. In the landmark decision discussing "comity of nations", the Supreme Court said:

> "No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, . . . shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the 'comity of nations'. . . .
>
> " 'Comity', in the legal sense, is neither a matter of absolute obligation, on the one hand, nor one of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."

*Hilton* v. *Guyot,* 159 U.S. 113, 163-64 (1895). *See McFarland* v. *McFarland,* 179 Va. 418, 430, 19 S.E.2d 77, 83 (1942), where this Court approved a similar definition of international comity.

■ Applying the principles underlying the full faith and credit doctrine and those announced in *Hilton* and *McFarland,* we believe that the courts of this Commonwealth, when required to determine whether comity should be granted to a child custody order entered by a foreign nation, should conduct a three-fold inquiry:

(1) Did the foreign court have jurisdiction over the parties and the subject matter?

(2) Was the procedural and substantive law applied by the foreign court reasonably comparable to that of Virginia?, and

(3) Was the foreign order based upon a determination of the best interests of the child?

When Virginia courts find affirmative answers to all three questions, they should grant comity to the foreign order unless, since the time it was entered, a change in conditions justifies modification in the interest of the child..

■ Addressing the first inquiry, we note that Mr. Oehl does not deny that the English court had subject-matter jurisdiction or that Mrs. Oehl properly invoked that jurisdiction. Nor does he contest the thesis that, by responding to lawful service of process, he submitted his person to the jurisdiction of that court. We have held that a court which has *in personam* jurisdiction over both parents may enter a child custody order even in the absence of the child, *Gramelspacher* v. *Gramelspacher,* 204 Va. 839, 134 S.E.2d 285 (1964), and that, under necessitous circumstances, custody jurisdiction may attach when the child is present even though both parents are absent, *Falco* v. *Grills,* 209 Va. 115, 161 S.E.2d 713 (1968). The record shows that the Oehl children have never left England.

■ Satisfied that the English court had complete jurisdiction, we turn to the second inquiry.

Virginia courts will not recognize a foreign decree which was "falsely or fraudulently obtained or one which is contrary to the morals or public policy of this State" or one which "would prejudice [this] State's own rights or the rights of its citizens." *McFarland* v. *McFarland,* *supra,* 179 Va. at 430, 19 S.E.2d at 83.

But Virginia courts should grant comity to any order of a foreign court of competent jurisdiction, entered in accordance with the procedural and substantive law prevailing in its judicatory domain, when that law, in terms of moral standards, societal values, personal rights, and public policy, is reasonably comparable to that of Virginia.

Virginia's jurisprudence is deeply rooted in the ancient precedents, procedures, and practices of the English system of justice. A substantial portion of "[t]he common law of England" and the "writs, remedial and judicial, given by any statute or act of Parliament, made in aid of the common law" have been legislatively incorporated in the law of this Commonwealth. Code §§ 1-10 and -11. As the record in this case

illustrates, the prevailing English rules of procedure comport favorably with the concept of procedural due process as that concept has evolved in this State and nation. And nothing in the substantive law of child custody and parental rights of visitation applied by the English court is contrary to our own law. Indeed, the English order placing geographical limits on the visitation rights of a non-custodial parent is similar to the decree we upheld in *Branham* v. *Raines,* 209 Va. 702, 167 S.E.2d 355 (1969). *See also Carpenter* v. *Carpenter,* 220 Va. 299, 257 S.E.2d 845 (1979).

Finding the laws applied by the English court and those of Virginia reasonably comparable, we consider the third inquiry.

■ The order appealed from was based upon a finding that Mr. Oehl "is entitled to reasonable Stateside rights of visitation".

"In Virginia, we have established the rule that the welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate."

*Mullen* v. *Mullen,* 188 Va. 259, 269, 49 S.E.2d 349, 354 (1948).

One of the issues in *Falco* v. *Grills, supra,* was whether the chancellor had erred in refusing to grant full faith and credit to a New York Surrogate's Court decree appointing a guardian for an infant girl. Quoting the rule in *Mullen* and noting that New York courts follow the same rule, we affirmed the chancellor because, in the New York proceeding, there had been "no adjudication made by a court of competent jurisdiction that in its considered judgment it was in the best interest of the infant for her custody to be awarded to [the guardian]." 209 Va. at 126, 161 S.E.2d at 720.

A derivative corollary to the *Mullen* rule is that the visitation rights of a non-custodial parent are subordinate to the welfare of the infant. This corollary, implicitly applied in *Branham* v. *Raines, supra,* was the principle upon which the English court based its order modifying Mr. Oehl's rights of visitation. And here, unlike the situation in *Falco,* the foreign court made a formal adjudication concerning the welfare of the children.

■ Nothing in the record contradicts the validity of that adjudication, and there was no evidence of a subsequent change in conditions sufficient to justify a modification thereof. Finding affirmative answers to each of the questions in the three-fold inquiry we have pursued, we hold that the chancellor erred in refusing to grant comity to the English

order.* It follows that he also erred in predicating suspension of spousal and child support payments upon denial of comity. The order appealed from will be reversed. The cause will be remanded for the entry of a new decree vacating the June 30, 1978 order, granting comity to the English order, and reinstating the former spousal and child support award *nunc pro tunc* June 30, 1978.

*Reversed and remanded.*

---

* While this appeal was pending, the General Assembly enacted, effective January 1, 1980, the Uniform Child Custody Jurisdiction Act. Code §§ 20-125 *et seq.* The general policies of this act and the specific provisions "relating to the recognition and enforcement of custody decrees of other states apply to custody decrees . . . rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons." Code § 20-146.