### Richmond

SHELIA J. MIDDLETON

V.

BRIAN C. MIDDLETON

Record No. 822080.

HERBERT LEE LYONS

V.

MARGARET VERITY FLOWER LYONS

Record No. 822102.

March 9, 1984.

Present: All the Justices.

*Donald K. Butler (Morano and Butler,* on brief), for appellant. (Record No. 822080.)

*B. VanDenburg Hall* for appellee. (Record No. 822080.)

*Bruno A. Ristau (Gordon P. Peyton; Peyton, Prendergast & Shapiro, Ltd.; Kaplan, Russin & Vecchi,* on brief), for appellant. (Record No. 822102.)

*Robert G. Culin, Jr. (Betty A. Thompson, Ltd.,* on brief), for appellee. (Record No. 822102.)

COMPTON, J., delivered the opinion of the Court.

These cases, each involving an international child custody dispute, afford us the first opportunity to apply the Uniform Child Custody Jurisdiction Act (UCCJA), Code §§ 20-125 through 146, which became effective January 1, 1980, Acts 1979, ch. 229.

In *Middleton,* the dispositive question is whether the trial court properly exercised jurisdiction over the issue of child custody, ruling that Virginia and not England was a more convenient forum to make the custody determination. In *Lyons,* the basic issue is whether the trial court properly refused to exercise jurisdiction over the question of child custody, deciding to defer to the courts of England where a prior custody action was pending.

### Middleton

Appellant Sheila J. Middleton and appellee Brian C. Middleton were married in England during 1962. They immigrated to

the United States in 1967 and he became employed as an engineer for a chemical company. They resided in Chesterfield County where two daughters were born, one in 1969 and the other in 1971.

In 1974, the mother returned to England with the children. In 1977, the trial court granted the father a final divorce, without objection by the mother, upon the ground that the parties had lived separate and apart without any cohabitation and without interruption for one year. *See* Code § 20-91(9)(a). The divorce decree awarded custody of the children to the mother, provided reasonable visitation rights to the father, and required him to pay child support at the rate of $200.00 per month.

After the children left Virginia with their mother, the father visited them in England until they were of sufficient age for unaccompanied air travel. From 1978 to 1981, by agreement of the parties, the children spent periods of time with the father in Virginia. He remarried in 1979 and now lives in Annandale, employed by a bank.

In August of 1981, while the children were with the father in Virginia for a regular summer visitation, he instituted the present proceeding by filing a petition for custody based on an alleged change in circumstances since entry of the divorce decree. The mother had no warning that the husband would seek to vary the custody order. The father charged that the mother was guilty of immoral behavior in England in the children's presence, that she intended to separate the children by placing one with an aunt and keeping the other with her, that she made degrading comments about the father in the presence of the children, that she had attempted to frustrate his right of access to the children, that the children desired to remain with the father, and that she had mistreated the children. The mother received notice in England of the petition four days after it was filed and subsequently learned that the father would not return the children to England on August 31 as prearranged.

The mother came to Virginia without knowledge of the father, retrieved the children on September 2 from the father's home while he was away, and took the children back to England. On the same day, the court below entered an ex parte order enjoining the mother from removing the children from Virginia and the United States.

On Friday, September 4, the mother initiated proceedings in an English court to have the children made Wards of Court and to have their care and control granted to her. They returned to their English school the following Monday, having missed only the first three days of the school session.

On September 18, the mother filed a plea to the jurisdiction in the Chesterfield Circuit Court. Relying on the UCCJA, she requested the trial court not to exercise jurisdiction and to defer to the appropriate English court for any determination of a change of custody. After a hearing at which only the father presented evidence, the chancellor overruled the mother's plea by order entered November 16, 1981. The trial court decided that it had continuing jurisdiction over the custody issue and that Virginia was the more convenient forum for disposition of the matter.

One week later, the English High Court of Justice made the children Wards of Court and ordered that the children remain in the interim care and control of the mother. The High Court restrained the father from interviewing or deposing the children until the custody issue was decided. It ordered preparation of a welfare report on the children and a copy forwarded to the Chesterfield court as well as to the English court.

Subsequently, and during the next nine months, the Virginia trial court conducted hearings, considered various motions filed by the father, and entered orders pursuant to those motions, all without the participation of the children or the mother, who refused to appear either personally in Virginia or for depositions in England. In August of 1982, the trial court entered the order from which the mother appeals. The chancellor, among other things, found the mother in contempt of court because she removed the children from the United States with knowledge of the order of September 2, 1981 prohibiting such removal; she failed to appear as ordered for depositions in England and in Fairfax, Virginia; and she violated orders respecting the father's visitation rights. Noting that the mother "has been accorded every reasonable opportunity to present her case and she has failed and refused to do so" and reciting review of the English Welfare Officer's report, the trial court determined that the children's best interests would be served by changing their custodial care. Consequently, the court awarded the father sole custody of the children, subject to reasonable visitation rights in the mother. The court further assessed a fine and a

jail term against the mother for contempt and terminated the obligation of the father to pay child support.

## Lyons

Appellant Herbert Lee Lyons married appellee Margaret Verity Flower Lyons, a British subject, in Arlington County in 1971. A son was born in 1975. Marital discord developed. On April 13, 1982, the mother left the marital abode without notice to the father, took the child, and went to England. The father, a government lawyer, was out-of-state at the time.

On the next day, the mother filed an "Originating Summons" in the English High Court of Justice, Oxford District Registry. She asked that the child be made a Ward of Court and that the court award her the care and control of the boy.

On April 30, the father filed the present suit against the mother for divorce based on wilful desertion. Asserting the child's whereabouts were unknown, the father requested that he be awarded custody of the child.

On May 20, the father was served with the English summons, along with a notice advising that the child had become a Ward of Court on April 14. This was the first knowledge the father had after April 13 of the location of the child and mother. According to the notice, the effect of the wardship is to prohibit the child from marrying or leaving England or Wales without leave of the High Court and, further, to prohibit any material change in the child's welfare, care and control, or education without leave of court.

The father then moved the High Court to terminate the wardship and to order the child's return to Virginia for a decision on custody. After a hearing at which both parents testified personally, the High Court granted the father's request on June 28. The mother appealed. On July 6, the Supreme Court of Judicature, Court of Appeal, reversed the decision of the High Court. It ordered that the child remain in the interim care and control of the mother and that further English proceedings on the issue of custody be expedited.

In the meantime, the mother had been served with the divorce papers. She filed an answer and cross-bill in Virginia seeking a divorce from the father on the ground of cruelty and asking the court to award her custody of the child.

Next, the father filed in the Virginia court a motion that an order be entered compelling the mother to return the child to Fairfax County. In considering the father's motion, the chancellor reviewed the record of the English proceedings. After a hearing on August 30, the court denied his motion, deciding to "grant comity" to the Court of Appeal's order of July 6. On September 23, the trial court entered the order from which the father appeals.

Subsequently, the trial court granted the father a divorce *a mensa et thoro* from the mother on the ground of wilful desertion occurring on April 13. The court dismissed the mother's cross-bill.

On December 20, after a custody hearing at which the parents again testified in person, the English High Court decided that the child should remain a ward of the court. The court also ruled that the mother should have care and control of the child and that the father should have access to the child as specified in the order.

### The UCCJA Generally

The Model Act was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1968. 9 U.L.A. 111 (1979). In a prefatory note to the Act, the Commissioners referred to the "growing public concern," *id.*, over the fact that every year thousands of children are shifted from state to state, and to other countries, as well as from one family to another, while their parents battle over their custody in the courts of several jurisdictions. Because of our mobile society, a child may have been moved from state to state even before the issue of his custody goes to court. When an order is entered deciding the issue, this frequently does not end the child's migration. Often, the parent who loses the custody fight is unwilling to accept the court's judgment. The dissatisfied parents will remove "the child in an unguarded moment or fail to return him after a visit and will seek their luck in the court of a distant state where they hope to find—and often do find—a more sympathetic ear for their plea for custody." *Id.* at 112.

The Commissioners noted that the emotional harm done to these children by "these experiences can hardly be overestimated." *Id.* "A child who has never been given the chance to develop a sense of belonging and whose personal attachments when beginning to form are cruelly disrupted, may well be crippled for life, to his own lasting detriment and the detriment of society." *Id.* The Commissioners observed that this "unfortunate state of af-

fairs has been aided and facilitated rather than discouraged by the law." *Id.* They said that there was no statutory law in the area and that the case law was unsettled. There was no certainty as to which state had jurisdiction when persons seeking custody approached the courts of several states simultaneously or successively. And because the Supreme Court of the United States had never settled the question whether the full faith and credit clause of the Constitution applied to custody decrees, *see, e.g., Ford* v. *Ford,* 371 U.S. 187 (1962); *Kovacs* v. *Brewer,* 356 U.S. 604 (1958); *New York ex rel. Halvey* v. *Halvey,* 330 U.S. 610 (1947), many states felt free to modify foreign custody decrees almost at random, usually on the ground that a change in circumstances warranted a custody award to a different person.

Given this status of the law, courts of several states often acted in isolation and in competition, with unfortunate results. Courts of two states would simultaneously award custody of the same child to different parents. The parents would not know which court to obey. Also, the person who had possession of the child had a tactical advantage because physical presence of the child enabled courts to assume jurisdiction and often assured the parent in possession of a decision in his or her favor. This generated the practice of child stealing and kidnapping to gain possession of the child. 9 U.L.A. at 113.

The Commissioners reported that uniform legislation had been advocated for years to bring interstate stability to custody awards and to "remedy this intolerable state of affairs where self-help and the rule of 'seize-and-run' prevail[ed]." *Id.* The Model Act was adopted by the Commissioners "to bring some semblance of order into the existing chaos." *Id.* at 114. It was intended that the general policies of the Model Act and some of its specific provisions apply to international custody disputes. *Id.*[1] At least 45 states have adopted the Model Act in some form. *Id.* at 15 (Supp. 1983).

### Purposes of the Virginia UCCJA

■ Given this background and upon consideration of the Virginia UCCJA, we think a number of the general purposes of the Model Act appropriately apply to Virginia. We perceive that

---

[1] *See generally* Bodenheimer, The Hague Draft Convention on International Child Abduction, 14 Fam.L.Q. 99 (1980); Note, Law and Treaty Responses to International Child Abductions, 20 Va.J. Int'l L. 669, 677 (1980).

the Virginia UCCJA was enacted to avoid jurisdictional competition and conflict with courts of other states in matters of child custody; to promote cooperation with courts of other states so that a custody decree is rendered in a state which can best decide the issue in the interest of the child; to assure that litigation over the custody of a child ordinarily occurs in the state that is most closely connected with the child and his family and where significant evidence concerning his care, protection, training and personal relationships is most readily available; to assure that the courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state; to discourage continuing controversies over child custody; to deter abductions and other unilateral removals of children undertaken to obtain custody awards; to facilitate the enforcement of foreign custody orders and to avoid relitigating foreign custody decisions in this state so far as possible; and to promote the exchange of information and other forms of mutual assistance between courts of this state and those of other states concerned with the same child. *See id.* at 116-17 (1979).[2]

### The UCCJA as Pertinent to Middleton

It will be remembered that the children had been retained in Virginia by the father beyond the agreed period of summer visitation and the trial court decided that it was a more convenient forum than England to decide the custody issue.

The mother-appellant recognizes that, even though the Middleton children had been removed from Virginia, the trial court had continuing jurisdiction to change or modify its decree as to their custody. *See* Code § 20-108; *Kern* v. *Lindsey*, 182 Va. 775, 780-81, 30 S.E.2d 707, 709 (1944). The mother argues that the court

---

[2] *See generally* Comment, The Uniform Child Custody Jurisdiction Act in Virginia, 14 U.Rich.L.Rev. 435, 437 (1980).

Because the UCCJA principally was relied on by the parties to these appeals, we do not consider the relationship of the federal "Parental Kidnapping Prevention Act of 1980," Pub.L. No. 96-611 §§ 6-10, 94 Stat. 3569 (codified at 28 U.S.C. § 1738A, 42 U.S.C. §§ 654, 663 (Supp. V 1981)) (1980), to the UCCJA. *See generally* Note, The Uniform Child Custody Jurisdiction Act and The Parental Kidnapping Prevention Act: Dual Response to Interstate Child Custody Problems, 39 Wash. & Lee L.Rev. 149 (1982). *See also* Ruby, Modification of an Out of State Child Custody Decree Under the Uniform Child Custody Jurisdiction Act and the Parental Kidnapping Prevention Act, 16 U.Rich.L. Rev. 773 (1982).

below, nonetheless, should have declined to exercise jurisdiction under UCCJA § 20-130. The statute provides, as pertinent here:

"A. A court which has jurisdiction under this chapter to make an initial or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.

. . . .

"C. In determining if it is an inconvenient forum, the court shall consider if it is in the interest of the child that another state assume jurisdiction. For this purpose it may take into account the following factors, among others:

1. If another state is or recently was the child's home state;

2. If another state has a closer connection with the child and his family or with the child and one or more of the contestants;

3. If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state; . . . ."

We are of opinion, considering the best interests of these children, that a proper application of the three statutory criteria required the trial court to decline to exercise its jurisdiction under these facts, given the principle that the general policies of the UCCJA "extend to the international area." Code § 20-146. And we are not reluctant to endorse an international deferral to the courts of England because "Virginia's jurisprudence is deeply rooted in the ancient precedents, procedures, and practices of the English system of justice." *Oehl* v. *Oehl*, 221 Va. 618, 623, 272 S.E.2d 441, 444 (1980) (pre-UCCJA case in which we granted discretionary comity to the order of an English court modifying the visitation clause of a child custody order entered in a Virginia court).

As we measure the evidence against the statutory factors, it is manifest, in the first place, that Virginia was not the children's "home state" within the meaning of the UCCJA. "Home state" is defined, in part, as "the state in which the child immediately preceding the time involved lived with his parents, a parent, a person acting as parent, for at least six consecutive

months." Code § 20-125(5). The Middleton children had lived with their mother in England since before entry of the initial custody award to the mother and for approximately seven years (1974 to 1981) before the father instituted the present custody proceedings. They had been in Virginia for only short periods of visitation during those seven years.

But under a technical reading of the UCCJA, England was not the children's "home state" because "state" is defined as "any state, territory, or possession of the United States, the Commonwealth of Puerto Rico, and the District of Columbia." Code § 20-125(10). Nevertheless, we give the UCCJA a liberal interpretation in order to accomplish the general purposes of the Act. In *Oehl*, we stated that the English procedural and substantive law of child custody was "reasonably comparable" to the law of Virginia. 221 Va. at 624, 272 S.E.2d at 444. Consequently, because of the statutory mandate that the "general policies" of the UCCJA "extend to the international area," Code § 20-146, we will treat England as the equivalent of a statutory "home state" under the *forum non conveniens* provisions of the Act.

In the second place, England had a "closer connection" with the children and "one or more of the contestants," the mother. The children had only sporadic contact with Virginia during brief visitation periods, at a time when they were living permanently with their mother in England.

Thirdly, "substantial evidence" concerning the children's present care, protection, training, and personal relationships was more readily available in England. The father has attacked the mother's moral conduct, relying on acts committed in England. Surely, the witnesses to support, and refute, such charges were physically present in England. He alleged she had mistreated the children. Certainly, the evidence to confirm or deny, that charge was more readily available in England where the children had spent most of their time since 1974. Furthermore, evidence about the home, neighborhood, school, juvenile, and adult influences on the children was more readily available in England.

Additionally, we cannot overlook the "child snatching" aspect of the case in order to be consistent with the general purposes of the UCCJA. While the father did not "snatch" the children in the true sense of the word, he engaged in an equivalent act by refusing to return them in violation of a visitation agreement; he procured a tactical advantage by his conduct. If we approve the

retention of jurisdiction by the trial court, it will tend to encourage such conduct in the future, contrary to one of the principal purposes of the UCCJA. *See* Code § 20-131(B).

 Thus, we hold that the chancellor erroneously applied the pertinent provisions of the UCCJA and abused his discretion in refusing to decide that the courts of England provided a more appropriate forum for decision of the custody issue. The August 24, 1982 order appealed from will be vacated; the custody, child support, and visitation provisions of the October 1977 divorce decree will be reinstated *nunc pro tunc* August 24, 1982; and the cause will be remanded for further proceedings not inconsistent with this opinion. The trial court will, of course, be guided by the provisions of Code § 20-130(E) in reaching a decision whether to dismiss or stay the Virginia proceedings, depending on the current status of the custody proceedings in the English court.[3]

## The UCCJA as Pertinent to Lyons

In this case, the mother deserted the father while he was away from the marital abode. Without notice, she took the child to England and immediately obtained a wardship order from the foreign court. The father filed for divorce and custody in Virginia. The wife made a general appearance in Virginia, filing a cross-bill and asking for an award of custody. Thereafter, the custody issue was litigated in England. After the court below refused to exercise jurisdiction, the English court made a merits custody determination upon a full hearing attended by the father as well as the mother. The father argues that the UCCJA required the Virginia trial court initially to exercise jurisdiction in the custody matter.

The father says the basic question presented is whether the courts of this State may deny a resident parent access to court when his child has been taken to a foreign state. The father asks us to uphold an important purpose of the UCCJA and to inhibit

---

[3] The appellant has violated Rule 5:38 by including in the appendix items that are not germane to the assignments of error. She designated "the entire record" to be printed, without making any apparent effort to eliminate immaterial documents. For example, printed in the appendix are copies of letters from counsel to the judge, the clerk, and other counsel; copies of extensive trial briefs, which are not appropriate for inclusion; copies of reported cases; and page upon page copied from treatises; we even have the benefit of one of our own cases copied from the Virginia Reports. Of the 664 pages in the appendix, at least 209 are not germane to any issue in the case. Accordingly, the appellant shall bear the cost of producing 31 percent of the appendix.

the practice of removing a local child across state lines to obtain a foreign custody decree favorable to the deserting parent.

Under the UCCJA, physical presence of the child as a jurisdictional basis in all but the most extreme cases has been eliminated. *Cf. Falco* v. *Grills*, 209 Va. 115, 161 S.E.2d 713 (1968) (custody jurisdiction attached when child was present in Virginia even though both parents were absent). Under the UCCJA, "[p]hysical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody." Code § 20-126(C). Under the UCCJA, custody ordinarily is to be determined where the child has the closest contacts. *See* Code § 20-126.

Under the UCCJA, as pertinent here, a court of this State which is competent to decide child custody matters has jurisdiction to make an initial custody decree if: Virginia has been the child's home state within six months before commencement of the proceeding and the child is absent from this State because of his removal by a person claiming custody and a parent continues to live in this State. Code § 20-126(A)(1)(ii). Again, "[h]ome state" is defined as the state where "the child immediately preceding the time involved lived with his parents . . . for at least six consecutive months . . . ." Code § 20-125(5).

The evidence is undisputed that Virginia was the child's home state at the time the father instituted the divorce suit and petitioned for custody on April 30, 1982. The child was born and raised in Virginia and, except for visits with his maternal grandparents in England, had lived exclusively in this State. The child was absent from Virginia due to removal by the mother, and the father continued to live here. Thus, by the prompt filing of his custody petition, the father preserved Virginia's "home state" jurisdiction.

But the trial court did not decide that it was without subject-matter jurisdiction. The chancellor ruled that it had jurisdiction over the parties because the father was a resident of Fairfax County and the mother had submitted to the jurisdiction of the circuit court. The trial court concluded nonetheless that it must grant comity to the English order of July 6 and thus refused the father's request to enter an order compelling the mother to return the child to Virginia. The court felt bound by *Oehl* v. *Ohel, supra.* The chancellor applied a three-fold inquiry set forth in *Oehl*, deferred to the English court, and said that it could, in the future,

"review and interpret the decision of the English Court of Appeal regarding access to the child."

However, *Oehl* was a pre-UCCJA case, as we have said. The mother concedes that the *Oehl* inquiry for discretionary comity of foreign decrees has been superceded by the UCCJA requirements for statutory comity of custody decrees of another country. Nevertheless, the mother contends the trial court properly decided not to exercise jurisdiction in the matter.

She argues that Code § 20-146 requires Virginia courts to grant comity to custody decrees of foreign nations. That statute provides, in part, that the provisions of the UCCJA "relating to the recognition and enforcement of custody decrees of other states apply to custody decrees . . . rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons." The mother points out that the father was served with the English Originating Summons on May 20 and was granted a full hearing in England within one month, at which he put on evidence in support of his position. She notes he appeared subsequently, by counsel, to argue before the Court of Appeal. Thus, she says, the father had notice and the opportunity to be heard, requiring the chancellor to grant comity to the English decree.

Additionally, she argues the trial court was required to refuse to exercise jurisdiction because of the mandate of Code § 20-129(A). That section provides, in part, that: "A court of this State shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter." The mother argues that a custody dispute was pending in England on April 14, sixteen days before the father filed the divorce suit in the trial court on April 30. Finally, the mother contends that the issue on appeal is moot because there was a full hearing attended by both parties and the High Court decided the merits of the custody question in December of 1982.

We reject the mother's contentions. Considering her arguments in reverse order, we conclude initially that the question presented has not been rendered moot. The focus of our inquiry is on the trial court's action in refusing to exercise jurisdiction. This occurred on September 23, 1982, when the order was entered denying the father's motion on the basis of a hearing on August 30.

Had the trial court taken jurisdiction at that time, it is likely the English court may have deferred to the Virginia court and may not have proceeded to adjudicate the custody question in December, the action which generates the mootness argument. The question whether the trial court should have exercised jurisdiction at the outset is an actual, justiciable controversy which by no means has been rendered academic by subsequent proceedings in England.

Next, we hold that Code § 20-129(A) did not prohibit the trial court from exercising its jurisdiction. It is true, as the mother argues, that when the father's custody petition was filed on April 30 as a part of the divorce suit, there technically was, in the language of the statute, "a proceeding concerning the custody of the child . . . pending" in England and England was "exercising jurisdiction substantially in conformity with" the UCCJA. Wardship had been granted ex parte and the originating summons issued but not served. Nevertheless, that circumstance alone does not mandate a wooden application of § 20-129(A) when foreign jurisdiction has been obtained by one parent spiriting the child away from its domicile.

Given the facts of this case, a contrary view would encourage a race to the courthouse, the prize of custody being awarded to the swifter and more devious parent. We will not endorse such conduct in view of at least two important purposes of the UCCJA applicable here: to deter unilateral removal of children to obtain foreign custody awards, and to assure that litigation over the child's custody occurs in the forum where the child and his family have the closest connection. As the father points out, the child had no conceivable connection with England on April 30 except for his forced physical presence there. The child was an American citizen, had lived all his life in Virginia, was attending school in Virginia, and had formed all his personal relationships in the Commonwealth. His present and future custody should be decided in Virginia.

Finally, all that we just have said applies with equal force to answer the mother's contention, based on § 20-146, that comity properly was accorded the Court of Appeal's July 6 order because the father received notice and participated in the English proceedings. Additionally, the fact that the father elected to appear and present evidence in the proceedings abroad does not lessen the obligation of the home state to exercise its jurisdiction.

The father was forced to litigate in England; the alternative was to disregard the foreign proceedings, thereby increasing the risk of an unfavorable ruling abroad.

Consequently, we will reverse the order of September 23, 1982 and remand the proceeding. Upon remand, the trial court shall exercise its jurisdiction and enter such orders as may be appropriate to enable it to adjudicate the custody dispute.

These two cases will be

*Reversed and remanded.*