**Alexandria**

PAUL M. LUTES

v.

LUCY M. ALEXANDER

No. 1681-90-4

Decided August 25, 1992

**COUNSEL**

Marvin D. Miller, for appellant.

Richard Crouch, for appellee.

OPINION

**DUFF, J.**—Paul M. Lutes appeals an October 19, 1990 order of the Arlington County Circuit Court denying his petition to vacate several previous orders entered in this case and holding him in contempt of court. He contends that: (1) the court orders granting visitation, change of custody, and transfer of the case to Tennessee were entered without jurisdiction; (2) the Soldiers' and Sailors' Civil Relief Act of 1940 voids the disputed orders entered by those courts; (3) the disputed orders were entered in violation of his rights to notice and due process; (4) the contempt order was entered erroneously; and (5) the appeal bond was excessive. We address each argument in turn. Because we find no merit to the husband's contentions, we affirm the decision of the trial court.

■ Under familiar principles, we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case Lucy Alexander Lutes. *Martin v. Pittsylvania County Dep't of Social Servs.*, 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986). "The burden is on the party who alleges reversible error to show by the record that reversal is the remedy to which he is entitled." *Johnson v. Commonwealth*, 12 Va. App. 391, 396, 404 S.E.2d 384, 387 (1991). We are not the fact-finders and an appeal should not be resolved on the basis of our supposition that one set of facts is more probable than another. *Keener v. Commonwealth*, 8 Va. App. 208, 214, 380 S.E.2d 21, 25 (1989). Because this litigation concerns events occurring during a period of time in excess of a decade, we describe the facts in some detail in the light of the principles stated above. When so viewed, the record reveals the following:

## I. FACTUAL BACKGROUND

In the fall of 1975, Major Paul Lutes (father) and Mrs. Lucy Alexander Lutes, now Lucy M. Alexander (mother), then residing in Henderson County, Texas, separated. The father took the two minor children to Virginia, while the mother remained in Texas. On March 22, 1976, the Arlington County Juvenile and Domestic Relations Court (J&DR), on petition of the father, awarded him their custody and ordered the mother to pay child support. The

mother properly perfected an appeal of this order to the Circuit Court.

The J&DR Court order allowed the mother visitation with the children only within Arlington County, Virginia. In July, 1976, the father threatened the mother that she would never see the children again if she did not obey his wishes. The record does not furnish the specifics of his wishes. The mother then took the children to Texas, in violation of the J&DR Court order. On September 15, 1976, the Henderson County, Texas court granted full faith and credit to the Virginia order without an independent evidentiary hearing, and awarded custody of the children to the father.

The mother then obtained a divorce on or about February 3, 1977, through the Harris County, Texas court. On May 19, 1977, the father, who had regained custody, took the children overseas to Turkey pursuant to his orders with the U.S. Air Force. At that time, the ruling of the J&DR Court was still on appeal de novo to the Arlington County Circuit Court.

In June 1978, the mother set the appeal for trial in the Circuit Court. However, on June 9, 1978, the father filed a petition by counsel to stay those proceedings under the Soldiers' and Sailors' Civil Relief Act of 1940 ("SSCRA"). The trial was not held until December 7, 1979. The Circuit Court affirmed de novo the father's custody of the children, but granted the mother visitation rights outside of Virginia. A written order was not entered at that time.

As part of the mother's attempts to notify the father of this ruling, particularly with regard to Easter visitation with the two minor children, the mother's Texas counsel, Mr. Joe H. Rentz, made several telephone calls to Izmir, Turkey on April 1, 1980. Mr. Rentz spoke to a Captain Harley, who advised him that he would attempt to communicate the message to Major Lutes as soon as possible. During a second call later that day, Mr. Rentz discovered that Major Lutes had been transferred to Ramstein, West Germany at the end of October, 1979. Upon receiving a new address and phone number, Rentz made several attempts to establish communication with Major Lutes at the Ramstein Air Force Base in West Germany. Although he did not succeed in reaching the father directly, Rentz again left messages concerning the

Easter visitation, which message he was assured would be conveyed to Major Lutes. On April 2, 1980, Major Lutes telephoned Mr. Rentz in Houston, Texas, advising him that D.H. Binder of Oakton, Virginia, held his power of attorney to act on his behalf and that all future communications regarding the case and visitation with the children should be directed to Lutes through Mr. Binder. Rentz then telephoned the Ramstein Elementary school and discovered that the summer vacation period for the minor children ran from June 12, 1980 through August 24, 1980.

On April 2, 1980, the Circuit Court entered an order affirming the J&DR Court order of March 22, 1976, with the specified modifications. This order was endorsed by Betty Thompson, who was counsel for the father at that time. Lutes asserts that he discharged his counsel prior to the entry of this order, but the Circuit Court did not grant Ms. Thompson leave to withdraw as counsel until April 4, 1980.

According to the April 2, 1980 order, the mother's visitation rights were subject to a number of conditions precedent. The Circuit Court also ordered the mother to bring current all past due child support by paying one-half directly to Major Lutes and one-half into a joint escrow account, to be remitted to Lutes after the first ordered visitation with the minor children. On May 30, 1980, the Circuit Court specifically found that the mother had "complied with all conditions precedent . . . entitling her to visitation with her children, Margaret C. Lutes and Alexander Lutes." The order further granted the mother specific summer visitation with both children. To facilitate this visitation, Major Lutes was ordered to place the children on Lufthansa Airlines Flight #713, departing Saarbrucken, West Germany at 7:10 a.m. on Monday, June 16, 1980, and arriving in Frankfurt, West Germany at 7:55 a.m. that same day. This flight connected with Lufthansa Airlines Flight #438 departing Frankfurt, West Germany at 9:40 a.m. on the same date direct to Atlanta, Georgia, arriving at 1:20 p.m. Atlanta time, where the mother would meet them and escort them to her home in Austin, Texas. The children were scheduled to depart the United States for Germany on August 11, 1980, to arrive at Saarbrucken at 2:35 p.m. on August 12, 1980. According to the mother, she waited at the Atlanta airport on June 16, but the children never arrived.

In August 1980, the mother petitioned the Arlington County Circuit Court for a change of custody based on the father's non-compliance with the visitation order. The father claims he received no notice of this petition, although the record contains evidence that the petition and notice of hearing were served on him in person by Daniel Slavens, an American attorney practicing in West Germany.

On September 26, 1980, the Arlington Circuit Court modified its former custody order, granting custody to the mother and terminating her child support obligation, as well as awarding her costs in the amount of $14,119 for her expenses in attempting to enforce her visitation rights. On November 5, 1980, a more formally drafted order provided that the mother would owe no child support after September 1980. Although Major Lutes contends he received no notice of this proceeding, the November 5, 1980 order specifically sets forth that he was duly served with a copy of the petition and notice of the hearing on August 24, 1980.

On March 30, 1981, the mother's counsel notified the Circuit Court that Germany evidently would not accept personal service on the husband in Germany, as the process was not in compliance with the Hague Convention on service of process. The mother then attempted to notify Major Lutes of the proceedings in accordance with the Hague Convention. However, the presiding judge of the Landsgerichts, Zweibrucken, executed a return of non-service on May 25, 1981. The document stated that Major Lutes could not be served because he refused to accept service. This return of non-service was received and filed in the Arlington Circuit Court Clerk's office on June 29, 1981.

Nothing further of significance occurred until 1987, when Major Lutes filed an action in the Probate Court of Davidson County, Tennessee, where the mother then lived, to domesticate a portion of the parties' Texas divorce decree involving property and money. The mother filed a reply and cross-complaint in the Davidson County Probate Court, requesting enforcement of the several orders entered in Virginia granting her custody and money damages. On August 31, 1987, the Tennessee Probate Court entered an order directing the father to explain the whereabouts and welfare of the parties' minor children. This order was served on Sabin R. Thompson, the father's designated Tennessee counsel. On October 13, 1987, the Tennessee court entered an order di-

recting the father to appear on December 15, 1987, at 9:00 a.m. to explain the welfare and whereabouts of the children. This order was also served on Sabin Thompson. On October 23, 1987, the father executed an affidavit stating that he had discharged Sabin Thompson and Thompson's law firm, which affidavit was filed with the Probate court. Thereafter, Mr. Thompson was permitted to withdraw as the father's counsel. Neither Major Lutes nor his counsel appeared in Tennessee Probate Court as ordered on December 15, 1987. A copy of the October 23, 1987 order was mailed to the father's address of record and to Mr. Thompson, and a new hearing was set for January 20, 1988. Again, neither Lutes nor counsel appeared.

On January 20, 1988, the mother filed a petition for contempt and moved the Tennessee court to appoint a guardian ad litem to protect the children's interests. An order was entered directing the father to appear on April 4, 1988 at 9:00 a.m. to show cause why he should not be held in contempt of court. A copy was mailed to the father. By order of February 17, 1988, Arlington Circuit Court Judge Monroe elected to stay the proceedings in Virginia pursuant to Code § 20-129 and to defer to Tennessee as the more appropriate forum for jurisdiction of the matter under Code §§ 20-126, 130, and 28 U.S.C. § 1738A(c)(2)(D)(i) and (f)(ii).

On February 24, 1988, the Tennessee Probate Court entered an order accepting Virginia's deferred jurisdiction over the custody dispute, noting that the case appeared to be governed by the Uniform Child Custody and Jurisdiction Act (UCCJA) and the Parental Kidnapping Prevention Act (PKPA), and finding that Major Lutes had sufficient previous legal notice of the proceedings. A hearing date was set for April 4, 1988, but again neither Major Lutes nor counsel appeared. The Tennessee court appointed Anne L. Russell as guardian ad litem of the parties' minor children. On April 17-19, 1988, Ms. Russell visited the children in Sicily pursuant to court orders. While in Sicily, she spoke to Major Lutes and notified him of Tennessee's jurisdiction over the custody dispute and of the relevant court orders entered. Major Lutes apparently refused to acknowledge Tennessee's jurisdiction over the matter.

On April 29, 1988, the Tennessee Probate Court awarded custody of the children to the mother, along with other relief that included a $502,000 tort judgment against the father. This judg-

ment was computed as $100,000 compensatory damages, $152,000 actual damages, and $250,000 punitive damages based on the suffering Major Lutes had caused by abducting the children and keeping them separated from the mother for over ten years. The judgment was characterized as child support. In addition, the Tennessee Probate Court specifically found that Major Lutes was entitled to no further notice.

In 1990, Major Lutes returned to the United States and filed a motion to vacate the Arlington County Circuit Court orders of September 26, 1980, November 5, 1980, and February 17, 1988. This motion was heard on October 2, 1990. The motion was denied, and Major Lutes was found in contempt of court and sentenced to ten days in jail. An appeal bond was set at $40,000 and a supersedeas bond was set at $400,000.

On October 19, 1990, the Arlington Circuit Court entered an order clarifying and extending its decision of October 3, 1990 and making findings: (1) that all prior orders were supported by reasonable notice under the circumstances; (2) that the father had received actual notice; (3) that any failure to receive notice was due to the father's willful determination to avoid service of process; (4) that Major Lutes was entitled to no further notice, as specified in the February 17, 1988 order; (5) that Major Lutes' motion to vacate previous orders was denied; and (6) that the Tennessee order would be accorded full faith and credit according to 28 U.S.C. § 1738(A). The order also imposed a sentence for contempt of court upon Major Lutes.

On January 18, 1991, the Arlington Circuit Court heard a Rule to Show Cause why Major Lutes should not be cited for additional contempt and also hearing his cross-motion to reconsider and vacate the October 2, 1990 order. The father's cross-motion was denied and the contempt citation was ultimately dismissed.

The father now appeals the October 19, 1990 ruling of the Arlington Circuit Court.

## II. PERSONAL JURISDICTION

Paul M. Lutes contends that the Arlington County Circuit Court had no jurisdiction when it acted in 1980 and 1988. We disagree.

## A. The Arlington Circuit Court Orders of 1980

Jurisdiction is determined by the facts as they exist at the time of filing. Code § 20-126. It is undisputed that Virginia was the children's home state in 1976. The J&DR Court properly asserted both personal and subject matter jurisdiction, and the father accepted positive relief in the form of custody and child support by the court's order of March 22, 1976. Courts do not lose jurisdiction simply because the parties and children leave the state while the litigation is pending. Here, the case was properly on appeal for a de novo hearing in the Circuit Court when the father left the country with the children. Both parties were clearly before the court by virtue of their previous appearance in the Arlington J&DR Court.

██ A Virginia trial court generally has continuing jurisdiction to revise a previous decree regarding child custody or maintenance. Code § 20-108. According to the UCCJA, a Virginia court may modify a previously existing decree if (1) the Commonwealth is the home state of the child at the time of commencement of the proceeding or has been the child's home state within six months prior to such proceedings; or (2) the child and at least one contestant have significant connections with the Commonwealth and substantial evidence is available here concerning the child's welfare; or (3) it appears that no other state would have jurisdiction under substantially conforming prerequisites of the subsection. Code §§ 20-125, 20-126. Thus, in determining whether Virginia retains jurisdiction, one element is whether another state can be shown to constitute a proper forum.

In *Middleton v. Middleton*, 227 Va. 82, 314 S.E.2d 362 (1984), the Court awarded custody of the two minor children to the mother, who moved with them to England, where the parties had married. While the children were in Virginia visiting the father, he initiated a custody proceeding in this state. Although the Court ruled that England had become the children's home state and constituted the more convenient forum, it first noted that "even though the [Middleton] children had been removed from Virginia, the trial court had continuing jurisdiction to change or modify its decree as to their custody." *Id.* at 93, 314 S.E.2d at 367. *See* Code § 20-108; *Kern v. Lindsey*, 182 Va. 775, 780-81, 30 S.E.2d 707, 709 (1944).

In the companion case of *Lyons v. Lyons*, 227 Va. 82, 314 S.E.2d 362 (1984), the mother left the marital home without notice while the father was out of state, taking the child with her to England. The Court found that "[t]he child was absent from Virginia due to removal by the mother and the father continued to live here. Thus, by the prompt filing of his custody petition, the father preserved Virginia's 'home state' jurisdiction." *Id.* at 97, 314 S.E.2d at 370. Despite the father's appearance and presentation of evidence at an English custody hearing, the Court rejected the mother's contention that the Virginia court had lost subject matter jurisdiction. Noting that "the child had no conceivable connection with England [at the time of father's Virginia custody petition] except for his forced physical presence there," the Court refused to "endorse such conduct in view of at least two important purposes of the UCCJA applicable here: to deter unilateral removal of children to obtain foreign custody awards, and to assure that litigation over the child's custody occurs in the forum where the child and his family have the closest connection." *Id.* at 99, 314 S.E.2d at 371. In *Lyons*, the Court actually ordered the Virginia trial court to assert jurisdiction after having previously deferred to the English court.

We find that Virginia did not lose jurisdiction simply because the Lutes children were away for more than six months.

B. The Transfer of Jurisdiction to Tennessee in 1988

██ The UCCJA allows a Virginia court discretion to decline jurisdiction and defer jurisdiction to another state. Code § 20-130. Although notice is required for the "exercise of jurisdiction," Code § 20-128(A), the Code does not require notice for a judicial act that is not an exercise of jurisdiction. The Code imposes notice requirements only on a court that is issuing a custody decree. Code § 20-128. The Virginia court's 1988 action was simply a decision declining to exercise jurisdiction and deferring to another state. It is proper to defer jurisdiction to another state under the UCCJA when the second state appears to be a more appropriate forum. *See Farley v. Farley*, 9 Va. App. 326, 387 S.E.2d 794 (1990).

The record supports the conclusion that Virginia remained unsuccessful at enforcing its own decrees for many years, due to the father's defiance and his shelter by various foreign locales. When

Major Lutes attempted to enforce a Texas judgment in Tennessee, where Ms. Alexander then lived, he purposefully availed himself of the Tennessee courts, thereby subjecting himself to personal jurisdiction in Tennessee. Having chosen Tennessee as an appropriate forum for a related action regarding the Texas judgment, Major Lutes cannot now complain that it was an inappropriate forum for enforcement of the Virginia decrees.

■ The now-challenged action by the Arlington County Circuit Court is exactly the type of action contemplated by the controlling interstate statutes, the PKPA and the UCCJA. Each of these statutes is jurisdictional rather than procedural. Under the PKPA, 28 U.S.C § 1738A(c)(2)(D), a court can acquire jurisdiction by another state's declining to exercise its own jurisdiction on the ground that the other state "is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction." The deferred-to state must also have personal jurisdiction according to its own laws prior to the deferral. Here, Major Lutes submitted to the jurisdiction of the Davidson County Probate Court in Tennessee by filing an action there against Ms. Alexander.

## III. SOLDIERS AND SAILORS' CIVIL RELIEF ACT

■ Major Lutes argues that the Soldiers' and Sailors' Civil Relief Act of 1940 (SSCRA) applies to child custody cases. *See Lackey v. Lackey*, 222 Va. 49, 278 S.E.2d 811 (1981). He further contends that when he released his counsel in early 1980, the court was obligated to appoint counsel to represent him. Although the SSCRA may apply to child custody cases in certain circumstances, the provisions of the SSCRA are discretionary. The SSCRA is meant to act as a shield, not a sword, for servicemen. A military member cannot litigate actively, discharge counsel, and take refuge behind the SSCRA merely because he is displeased with the proceedings. It is well established that this statute cannot be "put to unworthy use" and that its invocation requires good faith. *See Boone v. Lightner*, 319 U.S. 561 (1943); *Keefe v. Spangenberg*, 533 F. Supp. 49 (W.D. Okla. 1981); and *Roqueplot v. Roqueplot*, 410 N.E.2d 441 (Ill. App. Ct. 1980).

At the time Major Lutes filed his petition under the SSCRA, he was represented by able counsel, Betty A. Thompson, and she competently represented him long after he filed that petition. She

continued her representation until she could not prevent the issuance of an order requiring visitation. Although the father attempted to discharge her before she could endorse this order, the Court refused to allow the discharge to be effective prior to the entry of an order. Our Code of Professional Responsibility required Ms. Thompson to continue her representation of Major Lutes until she was given leave to withdraw by the court. *See* DR 2-108(c). The court allowed her to withdraw only after she endorsed the order granting the mother visitation rights. Several days after that order was endorsed by both counsel and entered by Judge Brown, Ms. Thompson withdrew from her representation of Major Lutes. However, Ms. Thompson's endorsement of the visitation order and her acceptance of positive relief on behalf of the father deprive him of any right to later argue that he was prejudiced by the court's discretionary failure to grant him SSCRA relief.

Major Lutes further argues that Betty Thompson would not properly have represented his interests after he had notified her that he wished to terminate their lawyer-client relationship. This argument ignores the clear mandates of DR 2-108(d), which states that "[u]pon termination of representation, a lawyer shall take reasonable steps for the continued protection of a client's interests, including giving reasonable notice to the client, allowing time for employment of other counsel." The trial court found that Ms. Thompson competently represented Major Lutes through April 4, 1980, and we find sufficient evidence in the record to support that determination.

Because appellant retired from the Air Force as of December 31, 1985, the SSCRA has no application to any litigation beyond that date.

## IV. NOTICE

Major Lutes argues that he received no notice and was given no opportunity to be heard in the matters of the 1980 change of custody or the transfer of jurisdiction in 1988. While this issue overlaps to some extent the concept of personal jurisdiction previously discussed, we will address it separately because of its due process implications.

■ Generally, sufficient notice may be given "by certified mail, return receipt requested, addressed to the person to be served." Code § 20-128(A)(2)(a). Additionally, a federal court applying Virginia law has held that attempted service by certified mail may be good service even though not signed by the recipient. *Maxie v. Fernandez*, 649 F. Supp. 627 (E.D. Va. 1986). In *Maxie*, the court found that the plaintiff's notice by certified mail to her ex-husband's home and business addresses as she believed them to be "satisfies the requirements of due process and the requirements of [Code § 20-128]." *Maxie*, 649 F. Supp. at 628.

As we held recently in *Eddine v. Eddine*, 12 Va. App. 760, 406 S.E.2d 914 (1991), "[t]he requirements of the due process clause are satisfied if a party 'has reasonable notice and reasonable opportunity to be heard and to present his claim or defense. . . .'" *Id.* at 763, 406 S.E.2d at 916 (quoting *Dohany v. Rogers*, 281 U.S. 362, 369 (1930)). In *Eddine*, the husband left the country while an appeal of divorce proceedings was pending without notifying the court of his new address. The court ruled that "[t]he husband's failure to receive notice because he moved from his residence without notifying the clerk of his new address did not deprive him of due process of law." *Id.* at 764, 406 S.E.2d at 917. The *Eddine* court went on to hold that no further notice was required because the husband had failed to comply with Code § 8.01-319(A). "Although the headline of Code § 8.01-319 reads 'Publication of interim notice,' we believe that this section is not limited to only those cases initiated by publication. *See* Code § 1-13.9." *Eddine*, 12 Va. App. at 764 n.2, 406 S.E.2d at 917 n.2.

Here, as in *Eddine*, Major Lutes failed to provide his subsequent addresses as required by Code § 8.01-319(A). Ms. Alexander had properly appealed the J&DR decree and the case was pending before the Arlington Circuit Court well before Major Lutes left the country for Izmir, Turkey. Any failure to receive proper notice of the subsequent court proceedings was due to Major Lutes' own actions.

However, we need not determine whether the mother's attempts to serve Major Lutes by certified mail alone satisfied the requirements of due process and personal jurisdiction. In 1981, after numerous attempts to serve him by mail, Major Lutes was personally served with process by Mr. Daniel Slavens, an attorney then residing in Germany. Sworn affidavits of this personal service of

process were introduced at trial and specified as part of the record on appeal. Major Lutes now contends that this personal service is invalid because it was served on a Sunday, contrary to Code § 8.01-289. However, this argument was not presented adequately at trial. Therefore, we will not consider it for the first time on appeal. *Westbrook v. Westbrook*, 5 Va. App. 446, 451, 364 S.E.2d 523, 526 (1988); Rule 5A:18.

Major Lutes further contends that the personal service executed on him in Germany is insufficient because it did not comport with the requirements of service of process in Germany under the Hague Convention.[1] We agree that parties in the United States are obligated to follow the procedures set forth in the Hague Convention to obtain service of process. However, we find that the trial court did not err in determining that proper service was obtained on Major Lutes in this case. In *Rivers v. Stihl, Inc.*, 434 So. 2d 766, 769 (Ala. 1983), the Supreme Court of Alabama held that "[s]ince West Germany has objected to service within its borders by any method other than through the minister of justice, plaintiffs' attempts to serve the defendant by certified mail were ineffective." *Id.* at 769. The *Stihl* court further held that "[p]laintiffs were also unsuccessful in their efforts to serve the defendant through the minister of justice, because they failed to send the proper request form and failed to send duplicate copies of the summons and complaint in each language. Therefore, since the procedure outlined in the Hague Convention was not followed, service of process was not perfected." *Id.* at 769-70.

The case before us presents a much different situation than that involved in *Stihl*. There, the court noted that the plaintiff had failed to comply with requirements that were not "unduly onerous." *Id.* at 770. Here, Ms. Alexander attempted service upon Major Lutes in every conceivable manner. She expended significant amounts of time, effort and expense. She also attempted to serve process through German officials, as prescribed by the Hague Convention. Unlike the plaintiffs in *Stihl*, Ms. Alexander completed the appropriate paperwork and made every effort to serve Major Lutes properly. She was unsuccessful, not because of

---

[1] The Hague Convention is an international treaty designed to discourage child snatching by requiring that member countries, when discovering children who have been brought from their home by one parent, return such children to the country of their habitual residence.

any defect in her actions, but because Major Lutes refused to accept the appropriately rendered service.

Major Lutes' actions are verified by the return of non-service executed on May 25, 1981, by the presiding judge of the Landsgerichts, Zweibrucken, who stated that Major Lutes could not be served because he refused to accept service. To hold that a defendant may defeat the jurisdiction of the court by an arbitrary refusal to accept service is tantamount to granting anyone the right to avoid the valid jurisdiction of our courts based on a personal whim. We decline to so hold.

■ Finally, Virginia courts are required to give full faith and credit to foreign decrees not in conflict with our jurisdictional laws. U.S. Const. art. IV, § 1. Here, both Virginia and Tennessee agreed that this case was governed by the PKPA, and both courts specifically found that Major Lutes had adequate notice of the proceedings. If Major Lutes wishes to complain of some defect regarding Tennessee service of process, he must take his case to Tennessee in order to challenge its ruling.

The Arlington County Circuit Court has already heard Major Lutes' challenge of lack of notice. He was allowed to present extensive testimony and exhibits, while the mother presented no testimony except that of the children's guardian ad litem. Reasonable notice was shown by the 1980 and 1990 affidavits of service, which were executed by the service method specified at that time by Judge Brown. We find abundant evidence in the record to support the trial court's ruling that Major Lutes had full actual notice of the various proceedings in Tennessee and Virginia, as well as sufficient legal notice and service of process.

## V. THE CONTEMPT ISSUE

Major Lutes contends that the court erroneously found him in contempt of court without giving adequate notice. We find no merit to his argument. The record shows that Major Lutes had full notice of the hearing on the Rule to Show Cause why he should not be held in contempt for previous violation of court orders regarding custody and visitation. The Rule to Show Cause was served upon him by a deputy sheriff in open court on September 26, 1990, alleging with particularity the grounds on which it was based. Major Lutes had ample opportunity to present

his evidence at the trial level, and we are required to give due deference to the trial court's findings. We therefore affirm the October 2, 1990 contempt order of the Arlington County Circuit Court.

## VI. APPEAL BOND

Lastly, Major Lutes claims that the appeal bond was set at an exorbitant amount, arguing that he had no judgment against him in Virginia to justify such a bond. We disagree. The Arlington Circuit Court specifically determined in its October 19, 1990 order that the Tennessee judgment against Major Lutes in the amount of $502,000 was entitled to full faith and credit in Virginia under 28 U.S.C. § 1738(A). In addition, Ms. Alexander expended large amounts of money attempting to enforce the rights granted her by the Virginia courts. As early as September 1980, the Arlington Circuit Court found that she had already expended fees and costs in excess of $14,000 in attempting to obtain court-ordered visitation with her children. Major Lutes was ordered to reimburse Ms. Alexander for those expenditures, but has never done so. Many more costs have been incurred since that time.

Accordingly, the ruling of the trial court is affirmed in all respects.

*Affirmed.*

Baker, J., and Elder, J., concurred.