The judgment of the district court is accordingly

AFFIRMED.

**Ann C. MEADE, Plaintiff-Appellant,**

v.

**Frank O. MEADE, Defendant-Appellee.**

No. 86–1574.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1986.

Decided March 3, 1987.

R. Hayes Hofler, III (Pulley, Watson, King & Hofler, P.A., Durham, N.C., on brief), for plaintiff-appellant.

Susan Hollingsworth Lewis (Lewis & Associates, Chapel Hill, N.C., on brief), for defendant-appellee.

Before PHILLIPS and WILKINSON, Circuit Judges, Terrence W. BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

This case involves conflicting child custody orders entered by the states of Virginia and North Carolina. The United States District Court for the Middle District of North Carolina applied the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (PKPA), designed by Congress expressly to resolve such conflicts, and concluded that the Virginia order was entitled to enforcement by the courts of North Carolina under principles of Full Faith and Credit. Appellant Ann Meade appeals that final order, contending that the district court misapplied the PKPA. We disagree with her and affirm.

I

On November 10, 1982, the Virginia Circuit Court for the County of Pittsylvania awarded appellee Frank Meade an unconditional divorce from appellant Ann Meade. While the court had awarded the father temporary custody of their three children pending the final divorce decree, he voluntarily agreed to give the mother permanent custody of the two youngest children. In the final custody order, the father retained visitation rights for these two youngest children and retained permanent custody of the oldest child. When the divorce action commenced, both parents and all three children resided in Virginia. The mother and two younger children now reside in North Carolina.

In August 1985, the mother and father disagreed on plans to allow one of the younger children, Edmund, to live with the father in Virginia. The mother turned to a North Carolina state district court for an *ex parte* order, and the court assumed custody jurisdiction and awarded temporary legal and physical custody of Edmund to the mother in August 1985. The father responded by obtaining an *ex parte* order from the same Virginia circuit court which issued the divorce and initial custody decree. On September 3, 1985, this Virginia court declared that Virginia had continuing custody jurisdiction over all three children, that it had not and would not relinquish

jurisdiction, and that Edmund's best interests required his return to his father's custody. The Virginia court also requested the North Carolina court to vacate its *ex parte* order.

On September 24, 1985, the North Carolina court, rejecting the father's contentions that North Carolina lacked both personal and custody jurisdiction, awarded temporary custody of Edmund to the mother. The father did not appeal. On November 8, 1985, the Virginia court awarded temporary custody to the father and ordered the mother to deliver the child. The mother, who appeared before the Virginia court, did not appeal.

Rather than obey the Virginia order, the mother sought a declaratory judgment in United States District Court, claiming that North Carolina had exclusive jurisdiction under the terms of the PKPA. The district court disagreed, 650 F.Supp. 205, and the mother appeals.

## II

Before passage of the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A, the notorious confusion surrounding interstate custody disputes encouraged one parent to abduct his or her own children from the parent with custody and then shop for a forum which would enter a different custody order. Even when "parental kidnapping" was not involved, one or both divorced spouses often moved and sought a different custody order from their new state of residence. The result, seen with depressing frequency, was conflicting custody orders from two states, neither willing to concede the exclusive custody jurisdiction of the other. The victims of this jurisdictional disorder included not only the children and their parents, but also principles of interstate comity.

For a number of reasons, the federal courts proved unwilling to attack the problem. First, in a line of cases stemming from dictum in *Barber v. Barber,* 62 U.S. (21 How.) 582, 604–05 (1859) (Daniel, J., dissenting), federal courts refused to recognize subject matter jurisdiction over cases involving probate or domestic relations. 14

C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3609 (1975). Thus, even when the parties to a domestic dispute could satisfy the requirements of the federal diversity statute, 28 U.S.C. § 1332, a federal court would dismiss the case for lack of subject matter jurisdiction. Second, a line of Supreme Court decisions inconclusively suggested that federal courts might not grant full faith and credit to child custody decrees because they are invariably subject to modification and thus not "final," and because a contrary rule would entangle federal courts in the complicated determination of the merits of child custody orders. *See Ford v. Ford,* 371 U.S. 187, 193–94, 83 S.Ct. 273, 276–77, 9 L.Ed.2d 240 (1962); *Kovacs v. Brewer,* 356 U.S. 604, 607, 78 S.Ct. 963, 965, 2 L.Ed.2d 1008 (1958); *May v. Anderson,* 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); *New York ex rel. Halvey v. Halvey,* 330 U.S. 610, 612–15, 67 S.Ct. 903, 905–06, 91 L.Ed. 1133 (1947). *See also* Currie, *Full Faith and Credit, Chiefly to Judgments: A Role for Congress,* 1964 Sup.Ct.Rev. 89, 115.

The Uniform Child Custody Jurisdiction Act, now adopted by all 50 states, represented a novel effort to resolve the confusion by promulgating coherent and uniform rules for determining custody jurisdiction. *See Uniform Child Custody Jurisdiction Act,* 9 U.L.A. 111 (1979). The UCCJA sought to impose order on chaos principally by forcing the resolution of modification issues in the court which initially made a custody determination. Section 14 provides that when "a court of another state has made a custody decree, a court of this State shall not modify that decree" so long as the state with initial jurisdiction retains any basis for initial jurisdiction substantially in accord with the second state's jurisdictional law. Section 15, in turn, provides that the second state will enforce the decree of the initial state as long as the initial state retains custody jurisdiction. When both states have adopted the UCCJA, the apparent effect of §§ 14 and 15 is to give continuing exclusive jurisdiction to the initial state so long as that state retains a

"significant connection" basis for jurisdiction. This feature reduces the incentive for moving the child to another "home state" in order to manufacture a new custody jurisdiction.

Unfortunately, the UCCJA has proven to be an imperfect remedy. While all states have now adopted some version of the UCCJA, they have enacted different versions and state courts have varied in their interpretations of the Act's requirements. Some states, for example, conclude that the Act permits them to modify another state's order as long as it has jurisdiction under the Act to issue an *initial* order. *See* Krauskopf, *Remedies for Parental Kidnapping in Federal Court: A Comment Applying the Parental Kidnapping Prevention Act in Support of Judge Edwards*, 45 Ohio St.L.J. 429 (1984). The result has been variation where uniformity is desperately needed.

Congress designed the PKPA to remedy the defects of the UCCJA with a uniform federal statute. While under the UCCJA scheme some states profess to find *modification* jurisdiction so long as they can properly exercise *initial* custody jurisdiction, the PKPA prevents a second state from modifying an initial state's order except in carefully circumscribed situations. This presumption of continuing and exclusive jurisdiction discourages dissatisfied parents from seeking new custody orders from a second state. Differently stated, the statutory presumption encourages parents to concentrate their energies on presenting all evidence about their child's best interests in the courts of a single state, ordinarily the court which entered the initial custody decree.

██ The PKPA's relatively simple criteria for identifying the one state with custody jurisdiction must be applied by state courts themselves when they are asked to resolve a child custody dispute. The PKPA quite simply preempts conflicting state court methods for ascertaining custody jurisdiction. In addition, this circuit has already joined three others in recognizing that the PKPA creates federal question jurisdiction in the lower federal courts to resolve interstate custody disputes whenever conflicting custody decrees have issued in violation of the Act. *Hickey v. Baxter,* 800 F.2d 430 (4th Cir.1986). *See also McDougald v. Jenson,* 786 F.2d 1465 (11th Cir.1986); *Heartfield v. Heartfield,* 749 F.2d 1138 (5th Cir.1985); *Flood v. Braaten,* 727 F.2d 303 (3d Cir.1984). *But see Thompson v. Thompson,* 798 F.2d 1547 (9th Cir.1986). By empowering federal courts to act "as a referee between conflicting state custody decrees," and by providing relatively straightforward criteria for testing conflicting assertions of jurisdiction, the PKPA permits federal courts to grant declaratory and injunctive relief on the jurisdictional dispute without reassessing the *merits* of any particular state's custody determination. *Hickey,* 800 F.2d at 431.

### III

As the district court correctly recognized, application of the PKPA to this type of dispute is relatively simple. The governing principle of the PKPA appears in § 1738A(a), which provides that "authorities of every state shall enforce according to its terms, *and shall not modify ...* any child custody determination made consistently with the provisions of this section by a court of another state." (Emphasis added.) Section 1738A(d) then provides the crucial presumption of continuing jurisdiction:

> The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section *continues* as long as the requirements of subsection (c)(1) [that the state have jurisdiction as a matter of *its own* law] of this section continues to be met and such State remains the residence of the child or of any contestant. (Emphasis added.)

Section 1738A(f) restates the same presumption, but in terms of an interdiction of assertions of jurisdiction by a second state when the first state's jurisdiction continues.

A court of a State may modify a determination of the custody of the same child made by a court of another State, *if*—

(1) it has jurisdiction to make such a child custody determination; and

(2) the court of the other State *no longer has jurisdiction, or it has declined to exercise such jurisdiction* to modify such determination. (Emphasis added.)

The effect of §§ 1738A(d) and 1738A(f) is to limit custody jurisdiction to the first state to properly enter a custody order, so long as two sets of requirements are met. First, the PKPA defines a *federal* standard for continuing exclusive custody jurisdiction: the first state must have had proper initial custody jurisdiction when it entered its first order (according to criteria in the Act) and it must remain "the residence of the child or any contestant" when it later modifies that order. Second, the Act incorporates a *state law* inquiry: in order to retain exclusive responsibility for modifying its prior order the first state must still have custody jurisdiction as a matter of its own custody law. Even if the federal and state criteria for continuing jurisdiction are met, the first state's courts can, if they choose, voluntarily relinquish their jurisdiction in favor of a court better situated to assess the child's needs.

As the district court correctly observed, there is no question here that the Virginia circuit court properly exercised initial custody jurisdiction and refused to relinquish its jurisdiction voluntarily, and that Virginia remains the residence of one of the contestants. The only remaining question, then, is whether the Virginia court retained jurisdiction to modify its initial order purely as a matter of Virginia law.

At this point we must note that one Virginia court has answered this question on the precise set of facts at issue here: the Virginia Circuit Court for Pittsylvania County in its Order of September 3, 1985. We do not, however, hold that this Order definitively answers the state law question. To do so would, in effect, impose an exhaustion requirement on parties challenging one state's assertion of continuing jur-isdiction to modify its initial custody decree. Such an exhaustion requirement would conflict with the PKPA, which creates federal subject-matter jurisdiction to resolve the jurisdictional dispute as soon as conflicting custody decrees have issued. *See DiRuggiero v. Rodgers,* 743 F.2d 1009, 1015 (3d Cir.1984). Faced with inconsistent decrees, a federal court must determine the relevant state law in the ordinary fashion, and the Virginia opinion, while entitled to some deference, must be rejected if clearly mistaken.

This is, indeed, the appellant's basic argument. She insists that the opinion in *Middleton v. Middleton,* 227 Va. 82, 314 S.E.2d 362 (1984), interpreting the newly-enacted Virginia version of the UCCJA, demonstrates clear error by the Virginia circuit court. *Middleton* involved two consolidated cases. In the more pertinent case, a husband and wife were divorced by a Virginia court three years after the wife returned to England with their two children. The divorce decree awarded custody of the children to the mother. Several years later, when the children were in Virginia visiting the father, he sought and received a modification of the custody decree granting him sole custody of the children, in large part because of his allegations about the mother's immoral conduct in England. The Virginia Supreme Court concluded that the chancellor "abused his discretion in refusing to decide that the courts of England provided a more appropriate forum for decision of the custody issue." 314 S.E.2d at 369.

We cannot simply conclude from *Middleton* that the Virginia circuit court here also abused its discretion. In *Middleton,* for example, Virginia was not the "home state" of the children even when the initial custody decree issued, the children had only brief and sporadic contact with the father following the divorce, the only evidence regarding the mother's alleged immoral conduct was in England, and the father had refused to return the children in violation of his visitation agreement. 314 S.E.2d at 368–69. All of these factors in-

fluenced the *Middleton* decision, and none are present here.

*Middleton* helps, however, in defining the interplay between Virginia custody statutes. As *Middleton* makes explicit, the pre-UCCJA rule that a Virginia trial court enjoys continuing jurisdiction to change or modify its custody decree remains in effect. *See* Va.Code § 20–108; *Middleton,* 314 S.E.2d at 367. The court retains this modification jurisdiction even when the child no longer lives in the state. *Kern v. Lindsey,* 182 Va. 775, 30 S.E.2d 707 (1944). This modification jurisdiction continues so long as any one of four "grounds for jurisdiction" in the Virginia UCCJA continues, including whenever

> It is in the best interests of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a *significant connection* with this state, and (ii) there is available in this State *substantial evidence* concerning the child's present or future care, protection, training, and personal relationships
> . . .

Va.Code § 20–126(A)(2) (emphasis added). Finally, a Virginia court may *decline* to exercise jurisdiction "if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum." Va.Code § 20–130(A). *Among the factors* which the court should consider before declining jurisdiction on forum non conveniens grounds are: (1) whether another state "is or recently was the child's home state"; (2) whether another state has a "closer connection" with the child and his family; (3) whether "substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state," and; (4) whether the parties have agreed on another appropriate forum. Va.Code § 20–130(C); *Middleton,* 314 S.E.2d at 367–69.

■ These interconnected custody jurisdiction rules establish that the Virginia circuit court had continuing jurisdiction over

its initial decree under Va.Code § 20–108 and § 20–126(A)(2). As the district court observed, the father and child retained numerous "significant connections" with Virginia. The child was born in Virginia and lived there most of his life; many of his friends and relatives, including his father and his older brother still live there; he has spent significant time with his father since his mother received custody. Moreover, much of the evidence regarding the child's "present or future care, protection, training, and personal relationships" is to be found in Virginia rather than North Carolina.

Having determined that the Virginia circuit court retains jurisdiction to modify its initial custody order, we need only decide whether it abused its discretion in refusing to find that North Carolina offered a more convenient forum under Va.Code § 20–130. We decline to do so. The kinds of factors which influenced the Virginia Supreme Court in *Middleton* are absent here, and the Virginia circuit court might permissibly have concluded that the continuing connection of the child to Virginia and the evidence concerning the child's future in Virginia, coupled with the relative ease with which the mother could have presented her evidence before a Virginia court, made it unnecessary to defer to North Carolina's jurisdiction. Certainly the Virginia circuit court might have decided otherwise. We cannot, however, find abuse in this discretionary decision without simply imposing our judgment about the forum best able to protect the interests of the child—and we refuse to take that step.

Since the Virginia circuit court properly exercised its continuing jurisdiction to modify its initial order, the PKPA requires that the courts of North Carolina refrain from also exercising modification jurisdiction and that they afford the Virginia order full faith and credit. Accordingly, we affirm.

AFFIRMED.

TERRENCE WILLIAM BOYLE, District Judge, concurring:

Acting upon the assumption that this court has subject matter jurisdiction to en-

tertain this child custody action, the majority has carefully analyzed the powers and obligations of state courts under the Parental Kidnapping Prevention Act ("PKPA"). The majority's discussion of the PKPA's influence on state court jurisdiction over interstate child custody disputes is substantively correct. If the proper conduct of the North Carolina and Virginia state courts were the only issue present in this action, I would willingly join in the well-reasoned conclusions of the majority. However, another more fundamental issue requires scrutiny: that is, whether a federal district court may assert subject matter jurisdiction on the basis of 28 U.S.C. § 1738A.

This case does not mark the first occasion on which this court has asserted jurisdiction under the PKPA. As noted by the majority, the case of *Hickey v. Baxter*, 800 F.2d 430 (4th Cir.1986) touched on this point. In observance of the rule in this court that a subsequent panel may not contravene the holding of a prior panel, without intervening authority from the court en banc, I cast my vote with the majority. However, the duty of a federal court to examine at all times whether it has subject matter jurisdiction compels me to write separately. Although the issue has been treated neither by the parties nor the court below, I find persuasive authority that because Congress did not intend to create a substantive federal cause of action in enacting the PKPA, it did not create federal question subject matter jurisdiction in the lower federal courts either pursuant to 28 U.S.C. § 1331 or the "arising under" provisions of Article III of the Constitution.

## I.

Emphatically, the federal courts are courts of limited jurisdiction. Either their adjudicative powers derive from an identifiable source, or they do not exist. In this case federal subject matter jurisdiction may be founded upon either of two bases: diversity of citizenship or a federal question. Diversity jurisdiction is not pled; in fact, the parties expressly reject diversity as a basis for subject matter jurisdiction. Therefore, a discussion of it and the kind of

abstention analysis that is relevant to diversity is not germane. If this court has jurisdiction at all over this case, it must be due to the existence of a federal question.

The Constitution provides that Article III courts shall have jurisdiction over cases "arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority." U.S. Const. Art. III § 2. Accordingly, Congress enacted 28 U.S.C. § 1331, which states that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The appellant contends that the case before us "arises under" a law of the United States, namely 28 U.S.C. § 1738A.

The meaning of "arising under" has long been the subject of scholarly debate. Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3562. However, the definition of "arising under" clearly does not embrace every case in which a federal statute plays a role. Not every question of federal law emerging in a suit is proof that the controversy arises under federal law. *Gully v. First National Bank in Meridian*, 299 U.S. 109, 115, 57 S.Ct. 96, 99, 81 L.Ed. 70 (1936). A suit arises under the law that creates the action. *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916). The custody decrees in this case were imposed under the authority of the statutes of Virginia and North Carolina. The PKPA did not give rise to the custody proceedings, nor did it confer on the parents any *substantive* right which did not exist on an independent basis through state law. See Krauskopf, *Remedies for Parental Kidnapping in Federal Court: A Comment Applying the Parental Kidnapping Prevention Act in Support of Judge Edwards*, 45 Ohio St.L.J. 429, 441 (1984). State law, not federal, creates the right to custody, which is the relief sought here. It is true that state custody orders possess legal authority only insofar as they are consistent with the PKPA. However, the existence of a federal law favoring one custody decree over another does not

change the basis of the action here. *Gully,* 299 U.S. at 115, 57 S.Ct. at 98.

In effect, the federal PKPA is a choice of law rule. Instead of creating substantive rights, it simply produces a mechanical formula for the resolution of a conflict of laws problem. It is a natural outgrowth of the express language in the U.S. Constitution that "full faith and credit should be given in each state to the ... judicial proceedings of every other state." Article IV, Sec. 1. It has long been recognized by the Supreme Court that the language of Article IV, Sec. 1, of the U.S. Constitution is not a substantive basis for a federal question which would tolerate federal question subject matter jurisdiction in the district court.

This case concerns rights and duties established by state law and fully enforceable by the state courts. This being so, it is unimportant that conformity with the PKPA is necessary to legitimate the state court's decree. See *Gully,* 299 U.S. at 115–16, 57 S.Ct. at 99. The plaintiff-appellant is calling upon the federal judiciary to vindicate rights which have always been and continue to be a function of state law.

## II.

Both here and in *Hickey,* the court concludes that the PKPA grants jurisdiction to the lower federal courts. In a single sentence, *Hickey* accepts without argument the proposition that § 1738A expands federal jurisdiction. Citations to opinions of three other circuits constitute the extent of *Hickey's* analysis. The three cases cited were *McDougald v. Jenson,* 786 F.2d 1465 (11th Cir.1986); *Heartfield v. Heartfield,* 749 F.2d 1138 (5th Cir.1985); and *Flood v. Braaten,* 727 F.2d 303 (3rd Cir.1984).

The *Heartfield* opinion does little more than echo the *Flood* case and as such adds

little to the debate. If *Flood* and *McDougald* can withstand careful analysis, then *Hickey* may be confident in its reliance on these cases as authority. However, if *Flood* and *McDougald* wince under scrutiny, then *Hickey* may be in need of further attention.

*Flood v. Braaten,* decided by the Third Circuit, was the first federal court opinion to hold that the PKPA expanded the jurisdiction of the federal courts.[1] Close inspection of the *Flood* opinion, however, reveals the gossamer thinness of its reasoning. The *Flood* court acknowledges that the PKPA derives its inspiration and many of its provisions from the Uniform Child Custody Jurisdiction Act (UCCJA), a model law which established jurisdictional rules similar to those of § 1738A. Section 1738A, the *Flood* decision admits, was adopted in response to the failure of most states to adopt the UCCJA. The *Flood* court notes that § 1738A eliminated gaps in the UCCJA which had allowed several states to exercise concurrent jurisdiction over a single custody decree. From this fact, the *Flood* court concludes that the PKPA "instituted a new concept of custody jurisdiction." 727 F.2d at 312.

If the *Flood* court was referring to a new concept of *federal* jurisdiction, this leap of logic is a spectacular non sequitur. The history relied upon in *Flood* does not suggest that the PKPA has anything to do with federal jurisdiction. Rather, the *Flood* court's argument reveals the actual truth of the matter: that the PKPA merely sought to evolve uniform standards for state courts to follow. Even the remarks of the legislators cited by *Flood* in footnotes 24 through 26 offer no suggestion that the federal courts were to supervise the state courts in their application of those standards. 727 F.2d at 311–12.

---

1. The *Flood* court was not, however, the first federal court to address the existence or non-existence of subject matter jurisdiction under the PKPA. Indeed, both the Seventh Circuit and the District of Columbia Circuit (prior to *Flood*) addressed the issue in *dicta,* and both reached the conclusion that the PKPA did not create a federal remedy. *Lloyd v. Loeffler,* 694 F.2d 489, 493 (7th Cir.1982); *Bennett v. Bennett,* 682 F.2d 1039, 1043 (D.C.Cir.1982). In addition, a number of state appellate courts competently enforced the PKPA prior to *Flood.* See *Thompson, supra,* 798 F.2d at 1551, n. 3. It is apparent that the interventionist trend initiated in *Flood* did not fill a vacuum. The state courts had been handling PKPA cases before *Flood,* which rather than creating enforcement where there had been none, marked a clear deviation from established practice.

In my opinion, § 1738A contemplates the following procedural scenario: Where different states have entered incompatible custody orders, the aggrieved parties must seek redress in their respective state courts. If the issue has not been resolved upon the exhaustion of state remedies, an appeal as of right would lie in the United States Supreme Court. The *Flood* court rejected this possibility on the grounds that the Supreme Court might not possess sufficient resources to handle these cases. This argument is not terribly clever. The Supreme Court, under 28 U.S.C. § 1257, is forced to hear numerous appeals which it may well be inconvenient to hear. Where an appeal is concerned, as opposed to certiorari, convenience is beside the point. The whole idea behind the system of appeal is that the high court is compelled to resolve certain conflicts between sovereigns (e.g., when a state court holds a federal law unconstitutional or upholds one of its own laws against a constitutional challenge). The proposition in *Flood* that a U.S. District Court can usurp a portion of the Supreme Court's appellate jurisdiction on the ground of convenience is remarkable.

The *Flood* opinion concedes that the language of § 1738A makes no reference to federal jurisdiction and further admits that the legislative history does not conclusively indicate that such jurisdiction should exist. The core of the Third Circuit's argument seems to be the belief that the absence of federal jurisdiction would render § 1738A nugatory. This belief reflects a manifest distrust in the ability of the state courts to interpret and obey federal law. Had Congress meant to create federal jurisdiction, the PKPA could easily have said so on its face.

The *McDougald* court, although citing *Flood,* was apparently dissatisfied with the Third Circuit's treatment of the problem. Instead, the Eleventh Circuit attempted its own entirely separate analysis with the same erroneous result. The Eleventh Circuit in *McDougald* admitted that the PKPA created no federally implied cause of action and no federal remedy. The *McDougald* court did not long pause to consider how a court can derive jurisdiction from a statute that creates no cause of action. Instead, it purported to read a jurisdictional grant into § 1738A by appealing to the "well-pleaded complaint" test set out in *Franchise Tax Board of California v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983). Review of *Franchise Tax Board* reveals, however, that the Eleventh Circuit's citation of the case was highly selective. On the very next page after the one cited in *McDougald,* the *Franchise Tax Board* court stated the policy behind the "well-pleaded complaint" rule. The rule, the Supreme Court explained, is designed precisely to filter out "cases in which federal law becomes relevant only insofar as it sets bounds for the operation of state authority." 463 U.S. 11, 103 S.Ct. at 2847. Furthermore, *McDougald* clearly misapplied the well-pleaded complaint rule. The rule is not used to decide whether a given federal statute can confer jurisdiction in any case. Rather, the rule assumes that the statute in question creates jurisdiction. It asks a different question: namely, does the complaint state a claim which "arises under" a statute which is already conceded to create jurisdiction? In seeking to prove jurisdiction under the PKPA, *McDougald* used a test which assumed that jurisdiction existed as a given. *McDougald* reaches its finding of jurisdiction by a feat of circular reasoning. If one were to accept *McDougald's* interpretation of the well-pleaded complaint rule, the rule would be clearly overbroad. For example, I see no way to interpret the well-pleaded complaint rule in such a way as to let PKPA cases into federal court while keeping other full faith and credit cases out.

A careful reading shows that the *McDougald* court's assertion of jurisdiction is wholly conclusory and lacking in support. Curiously, the *McDougald* opinion states the most applicable definition of "arising under" from *Gully,* only to ignore that definition a scant page later. The precedents cited by this court in *Hickey* do not withstand analysis.

### III.

As was readily admitted by the Third Circuit in *Flood,* the PKPA is entirely si-

lent as to whether it establishes any jurisdictional power in the lower federal courts. By contrast, the role of the state judiciaries is prominently featured in the PKPA: "The appropriate authorities of every State shall . . .;" "A court of a State may modify . . .;" "A court of a State shall not exercise jurisdiction. . . ." 28 U.S.C. § 1738A(a), (f), (g). The statute, by its express terms, addresses the states and particularly the state courts. *Thompson v. Thompson*, 798 F.2d 1547, 1552 (9th Cir.1986). When one considers the overt emphasis of the PKPA on state court jurisdiction and procedure, the absence of any reference to the federal judiciary becomes all the more significant.

The legislative history of the PKPA is illuminating. The *Thompson* opinion cited above offers a highly detailed and persuasive discussion of this history, little of which need be repeated here. However, it is apparent that Congress did not ignore the possibility of conferring federal jurisdiction by the express terms of the PKPA. Rather, the Subcommittee on Crime of the Committee on the Judiciary of the House of Representatives considered versions of a parental kidnapping statute which established federal jurisdiction by their language. However, these versions were rejected in favor of the current law, which is facially silent on the issue. This silence speaks persuasively.

It is well established that certain enactments of Congress do not create federal jurisdiction merely because some ingredient of the cause of action is derived from federal law. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3562. A salient example of a federal statute which affects the conduct of state courts but confers no jurisdiction on the federal courts is 28 U.S.C. § 1738, better known as the Full Faith and Credit Clause. As the Supreme Court has unambiguously stated, the Full Faith and Credit Clause

only prescribes a rule by which courts, Federal and state, are to be guided when a question arises in the progress of a pending suit as to the faith and credit to be given by the court to the public acts, records, and judicial proceedings of a state other than that in which the court

is sitting. * * * [T]he clause has nothing to do with the conduct of individuals or corporations; and to invoke the rule which it prescribes does not make a case arising under the Constitution or Laws of the United States. *Minnesota v. North Securities Co.*, 194 U.S. 48, 72, 24 S.Ct. 598, 605 [48 L.Ed. 870] (1904).

Like the Full Faith and Credit Clause, the PKPA merely instructs state courts in their relations with each other. It does not set up the federal courts as a referee. It is hard to understand how the PKPA can ordain federal jurisdiction when the Full Faith and Credit Clause does not. It is highly significant that, in enacting the PKPA, Congress juxtaposed the new act to § 1738. Surely it is logical to view § 1738A as merely an addendum to or a more specific elaboration upon the general policies of § 1738. I am unable to determine why this court should find § 1738 incapable of creating jurisdiction while finding § 1738A not to be so limited.

### IV.

Another danger looms on the horizon beyond *Hickey* and the instant case. This danger arises from the majority's decision not to require litigants to exhaust their state remedies before presenting their § 1738A claims to the federal district courts. By making the federal forum so easily available, the majority steps beyond the Third Circuit in *Flood* and in *DiRuggerio v. Rodgers*, 743 F.2d 1009 (3rd Cir. 1984), which declined to consider the issue. 727 F.2d at 312, n. 28; 743 F.2d at 1015. Today's opinion invites conflict and disharmony between all levels of the state courts and the lower federal courts. By failing to require exhaustion, the majority seemingly disregards a basic principle of federalism: that federal district courts must not substitute themselves for the state's appellate courts, even if the appealing party believes that his chances of success in state court are not auspicious. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607–09, 95 S.Ct. 1200, 1209–11, 43 L.Ed.2d 482 (1975), citing *Lynch v. Snepp*, 472 F.2d 769 (4th Cir.

1973). By declaring that litigants may call upon the federal courts to adjudicate claims under § 1738A without first exhausting their state remedies, the majority does precisely that which the Supreme Court in *Huffman* said must not be done. This court has placed in the hands of a federal district court that which properly belongs to state courts of appeal. The majority apparently assumes that state courts of appeal will not be faithful to their duties under federal law. The rulings here and in *Hickey* in the course of time will produce a deluge of domestic relations cases—cases which the state appellate courts are well-equipped to decide but now may never have the opportunity to hear.

## V.

The majority concludes today that the lower federal courts possess jurisdiction under the PKPA to mediate jurisdictional disputes between states regarding determinations of child custody. The majority claims that this assertion of jurisdiction has been the law of this circuit since the decision in *Hickey*. The question of federal subject matter jurisdiction over § 1738A cases is an important one, one which merits more critical examination than it has heretofore received. It deserves either en banc consideration or a definitive pronouncement from the Supreme Court.

If this were clearly a case of first impression with this circuit, I would vote to remand the case to the district court with instructions to dismiss for want of subject matter jurisdiction. However, recognizing the constraint of the court's opinion in *Hickey*, I respectfully submit this concurrence.