**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

D. LAMAR DELOACH; WILLIAM G.
HYMAN; HYMAN FARMS,
INCORPORATED; GUY W. HALE; JAMES
R. SMITH; HOUSTON T. EVERETT; D.
KEITH PARRISH,
　　　　　　*Plaintiffs-Appellees,*

　　　　　　v.

LORILLARD TOBACCO COMPANY;
PHILIP MORRIS USA, INCORPORATED,
　　　　　　*Defendants-Appellants,*

　　　　　　and

R.J. REYNOLDS TOBACCO COMPANY,
　　　　　　*Defendant-Appellee,*

　　　　　　and

PHILIP MORRIS INTERNATIONAL; R.J.R.
NABISCO HOLDINGS CORPORATION;
B.A.T. INDUSTRIES, PLC; BRITISH
AMERICAN TOBACCO COMPANY
LIMITED; J. P. TAYLOR COMPANY,
INCORPORATED; SOUTHWESTERN
TOBACCO COMPANY, INCORPORATED;
DIMON, INCORPORATED; STANDARD
COMMERCIAL CORPORATION;

No. 04-1923

PHILIP MORRIS INTERNATIONAL; LOEWS
CORPORATION; R.J.R. NABISCO,
INCORPORATED; UNIVERSAL LEAF
CORPORATION,
                                    *Defendants.*

DAVID DIPERNA,
                                    *Claimant,*

JIMMY K. LEE; W. DENNY LEE; DALE
R. LUCAS; SAMMY TANT,
                                    *Movants.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-00-1235-1)

Argued: October 26, 2004

Decided: December 6, 2004

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge
Niemeyer wrote the opinion, in which Judge Michael and Judge Motz
joined.

## COUNSEL

**ARGUED:** David Boies, BOIES, SCHILLER & FLEXNER, L.L.P.,
Armonk, New York; James T. Williams, Jr., BROOKS, PIERCE,
MCLENDON, HUMPHREY & LEONARD, Greensboro, North Car-

olina, for Appellants. Alan Mitchell Wiseman, HOWREY, SIMON, ARNOLD & WHITE, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Larry B. Sitton, Gregory G. Holland, SMITH MOORE, L.L.P., Greensboro, North Carolina; Carl J. Nichols, BOIES, SCHILLER & FLEXNER, L.L.P., Washington, D.C., for Appellant Philip Morris USA, Inc. Mack Sperling, Jennifer K. Van Zant, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina, for Appellant Lorillard Tobacco Company. Alexander J. Pires, Jr., CONLON, FRANTZ, PHELAN & PIRES, L.L.P., Washington, D.C.; Stuart H. Harris, Thomas A. Isaacson, Joseph A. Ostoyich, HOWREY, SIMON, ARNOLD & WHITE, L.L.P., Washington, D.C.; Richard M. Hutson, HUTSON, HUGHES & POWELL, Durham, North Carolina, for Appellees. W. Andrew Copenhaver, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina; Sean E. Andrussier, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Raleigh, North Carolina, for Appellee R.J. Reynolds Tobacco Company.

---

## OPINION

NIEMEYER, Circuit Judge:

In this appeal, we determine the impact on a settlement agreement, partially resolving a class action, of a second settlement agreement resolving the remainder of the same action.

Tobacco farmers commenced this antitrust class action against several tobacco manufacturers and dealers, alleging that the defendants conspired to violate the federal antitrust laws. The parties, except for R.J. Reynolds Tobacco Company ("RJR"), settled the case with a settlement agreement dated May 15, 2003 (the "First Settlement Agreement"). The First Settlement Agreement included two provisions for adjusting benefits to the plaintiff Class, and the triggering of these adjustments depended on the existence and timing of a later settlement agreement with RJR. The first provision adjusted the monetary payments that the settling defendants agreed to make to the Class based on the terms of any settlement that the Class might reach with RJR "on or before the day before the first day of trial." The second

provision adjusted the amounts of tobacco that the settling manufacturers agreed to purchase from Class members based on the terms of any settlement that the Class might enter into with RJR "before the beginning of trial."

The tobacco farmer Class did subsequently enter into a settlement agreement with RJR dated April 22, 2004 (the "RJR Settlement" or the "Second Settlement"). The district court found that the RJR Settlement was "reached" when it was signed on April 22, 2004, which was also the date scheduled for the beginning of trial. On motions filed by settling defendants Philip Morris USA, Inc. ("Philip Morris") and Lorillard Tobacco Company ("Lorillard") to trigger the adjustments available in the First Settlement Agreement based on the RJR Settlement, the district court entered an order dated June 4, 2004, concluding that the settling defendants were not entitled to either of the adjustments because the RJR Settlement was not reached or entered into before the triggering times specified in the First Settlement Agreement. Philip Morris and Lorillard appealed.

For the reasons given hereafter, we deny the Class's motion to dismiss this appeal based on its assertions (1) that the language of the First Settlement Agreement made the district court's resolution of the issues "non-appealable" and (2) that the district court's order interpreting the First Settlement Agreement was not a final appealable order. Because we conclude that the district court was not clearly erroneous in finding as a fact that the RJR Settlement was "reached after the day before the first day of trial," we affirm the district court's denial of the adjustment for any monetary payment required by the First Settlement Agreement. We reverse, however, the district court's legal interpretation of the First Settlement Agreement that the RJR Settlement was not "entered before the beginning of trial." Thus, we affirm in part and reverse in part.

I

In February 2000, seven tobacco farmers commenced this antitrust action against Philip Morris, Lorillard, Brown & Williamson Tobacco Corporation, RJR, and several leaf tobacco dealers, alleging that the defendants conspired to fix prices at tobacco auctions and to reduce tobacco growing quotas, in violation of the Sherman Act. The tobacco

farmers purported to represent a class of hundreds of thousands of tobacco farmers that the district court certified as a class on April 3, 2002, describing the class as:

> (1) all persons (including corporations and other entities) holding a quota [under the Federal Tobacco Program] to grow flue-cured or burley tobacco in the United States at any time from February 1996 to the present and (2) all domestic producers of flue-cured or burley tobacco who sold such tobacco in the United States at any time from February 1996 to the present.

On May 15, 2003, the tobacco farmers Class and all of the defendants, except RJR, entered into the First Settlement Agreement, and the district court approved that agreement on October 1, 2003.

The First Settlement Agreement provided two principal benefits to the tobacco farmers Class: (1) two cash payments consisting of a first installment of $135 million and a later conditional installment of $65 million, and (2) a commitment by the settling manufacturers to purchase U.S.-grown leaf tobacco in specified amounts over specified years. Each of these commitments was subject to a reduction adjustment should the Class enter into a settlement with RJR during a specified period. The second payment of $65 million was subject to a proportionate reduction if the plaintiff Class "*reached*" settlement with RJR "on or before the day before the first day of trial." And the manufacturers' agreement to purchase U.S.-grown tobacco was subject to a "most favored nations clause" under which the settling manufacturers' obligations under the First Settlement Agreement would be "no less favorable" to them "than those terms agreed to" in any agreement with RJR. The adjustment, however, applied only if a settlement with RJR was "*entered* before the beginning of trial."

Following the district court's approval of the First Settlement Agreement on October 1, 2003, the litigation continued against RJR, and trial was ultimately scheduled to commence on April 22, 2004, at 9:00 a.m.

During a settlement conference between counsel for the Class, counsel for RJR, and the district judge on Friday, April 16, 2004,

counsel for RJR explained that it had not settled the case earlier because "we assumed we were going to try the case because the settlement for us late would have been prohibitive. That clause [the most favored nations clause] ends, as I understand it, the day before the trial." The court recognized the problem for a settlement, explaining, "A final agreement, in my opinion, if you reach an agreement, should come only after the impaneling of the jury." The court stated further that it saw "nothing wrong[ ] in an attempt to settle this case today, with an understanding that this case will not be settled, if it is settled, until next Thursday when we impanel a jury." Later on April 16, after the court had left the attorneys to discuss settlement further, the parties indicated to the court that they had neared — if not reached — a tentative settlement. The district judge recalled, about that report:

> I heard that there was some agreement, or each of the parties at least had indicated, and this was some time later, that an amount of poundage and an amount of payment was, in fact, within the realm of what each one of them thought they could do. I indicated that I thought one of those two figures was not what it should be, and I asked them to go back and talk.
>
> And we came back and talked about the matter. And at that time, I think [Class counsel] indicated that is where they were at that point, and then [it] was a matter that he could take up with his clients. . . . And that after that, both sides indicated that they, I thought, said, I think we can work this out.

The following Monday, April 19, Class counsel assured counsel for Philip Morris that no settlement with RJR had been reached. Accordingly, as required by the First Settlement Agreement, on April 21 — the day before the trial was scheduled to commence — Philip Morris wired the second installment of $65 million to the Class.

On the morning of April 22 when the jury venire was in the jury room and the judge in his chambers, the Class and RJR signed the Second Settlement Agreement at the courthouse and submitted it to the court. When the district judge entered the courtroom, he stated:

> Good morning, everybody. I believe that I have heard that we have some signed papers. I have in chambers just reviewed some papers, which I find to be in order. And we will talk more about that in a few moments. But we do have a number of people waiting upstairs who have given of their time to be here.
>
> So, without objection, I'm going to bring those jurors down at this point and let them go.
>
> I do believe that the papers are signed now. Is that correct, Mr. Wiseman?

When counsel for both parties confirmed that the papers had been signed, the jury panel was called into the courtroom and told, "[J]ust about five minutes ago, the parties have signed an agreement in this case, and the agreement is that they have settled their differences. . . . For that reason, you are not going to have to serve as a juror in this case." The court then released the venire. On the same day, the district court preliminarily approved the RJR Settlement, subject to the class action notice and final approval procedure.

The RJR Settlement contained the same two components as were included in the First Settlement Agreement. RJR agreed to pay the class $33 million in cash and agreed to purchase from Class members 35 million pounds of tobacco annually for at least 10 years — for a total of 350 million pounds. The court observed with approval that the 35 million pounds per year RJR agreed to purchase, coupled with the 405 million pounds per year agreed to by the other manufacturers, provided a total commitment to purchase 440 million pounds of tobacco each year.

Because of the RJR Settlement, a week later Philip Morris filed a motion for the return of its second settlement payment in the amount of $65 million and for discovery relating to the RJR Settlement, and both Philip Morris and Lorillard filed notices with the court of the triggering of the most favored nations clause in the First Settlement Agreement. They argued that the Class and RJR had reached a settlement on April 16, or at least by April 21, and that even if the RJR Set-

tlement had not been entered into until April 22, at that time the trial had not yet "begun."

The district court issued an order on June 4, 2004, denying Philip Morris's motion for return of the $65 million payment and concluding that the most favored nations clause had not been triggered. The district court found "that the earliest the settlement was reached was April 22, 2004, the date on which it was signed," and since this was "after the day before the first day of trial, [Philip Morris] [was] not entitled to a reduction of its Second Settlement Payment." With respect to the most favored nations clause, which would not have been triggered if the trial had begun, the district court recognized conflicting authority for when a trial "begins" and reasoned that because there is a public policy against the strict enforcement of most favored nations clauses, "a settlement entered into on the day trial was scheduled to start, at the time the case was called for trial, with a jury venire present, was not entered into before the beginning of trial." It thus rejected all of Philip Morris and Lorillard's claims for adjustments under the First Settlement Agreement based on the RJR Settlement.

From the district court's June 4 order, Philip Morris and Lorillard filed this appeal. Thereafter, the Class filed a motion to dismiss this appeal, contending that the First Settlement Agreement bars appellants' resort to this court for interpretation of the settlement agreement's terms. They relied on § 4.8 of the First Settlement Agreement, which provides that any unresolved disputes relating to the tobacco leaf volume commitments must be brought to the district court for its "final and non-appealable resolution," and § 12.4(c), which provides "continuing and exclusive jurisdiction over the Settlement, including its administration," in the district court. The Class also argues in their brief that the district court's order was not an appealable order under 28 U.S.C. § 1291.

II

At the outset, we address the Class's motion to dismiss the appeal based on contractual waiver and an absence of finality of the district court's order. We address its arguments in order.

A

Pointing to §§ 4.8 and 12.4(c) of the First Settlement Agreement, the Class contends that the appellants agreed to waive any right to appeal. The Class argues that these sections evidence the parties' intent "to streamline dispute resolution through mediation and non-appealable district court resolution." Section 4.8 states that "[i]n the event of a disagreement regarding . . . compliance with the [tobacco leaf] volume commitments, the parties shall first engage in mediation. . . . If the parties are still unable to resolve their disputes, the parties shall bring the matter to the [district court] for its final and non-appealable resolution." The Class argues that the dispute over the most favored nations clause is "a disagreement regarding . . . compliance with the [tobacco leaf] volume commitments" that is addressed in § 4.8. And section 12.4(c) reserves to the district court "continuing and exclusive jurisdiction over the Settlement, including its administration." The Class argues that "the only construction that here gives meaning to both 'continuing' and 'exclusive' is one that bars appellate jurisdiction."

The First Settlement Agreement provides that North Carolina law governs its interpretation, and the parties agree that we are to apply North Carolina law. Under that State's law, as under general principles of contract law, our task is to "give ordinary words their ordinary meanings." *Internet East, Inc. v. Duro Communications, Inc.*, 553 S.E.2d 84, 87 (N.C. Ct. App. 2001); *see also Harris v. Latta*, 259 S.E.2d 239, 241 (N.C. 1979) ("In construing contracts ordinary words are given their ordinary meaning unless it is apparent that the words were used in a special sense"); *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 127 S.E.2d 539, 541 (N.C. 1962) ("When the language of a contract is clear and unambiguous, effect must be given to its terms, and the court, under the guise of constructions, cannot reject what the parties inserted or insert what the parties elected to omit"). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 467 S.E.2d 410, 411 (N.C. 1996); *see also Fidelity Bankers Life Ins. Co. v. Dortch*, 348 S.E.2d 794, 796 (N.C. 1986).

Giving the language of the First Settlement Agreement its ordinary and natural meaning, we do not read §§ 4.8 and 12.4(c) to support the

Class's motion to dismiss. While the most favored nations clause, if triggered, would affect the volume of appellants' purchase commitments, this action is not "a disagreement regarding . . . compliance" with those commitments, as governed by § 4.8. Rather, it is a dispute over the interpretation of a contractual term in another section of the agreement.

Similarly, we conclude, given the provision's plain language, that the Class's reading of § 12.4(c) is too broad. The district court's maintenance of "continuing and exclusive jurisdiction" over an agreement is not inconsistent with this court's exercise of appellate jurisdiction to review the district court's orders. *Cf. Marino v. Pioneer Edsel Sales, Inc.*, 349 F.3d 746, 753 (4th Cir. 2003) (discussing "continuing jurisdiction" in terms of a district court's ability to resolve disputes related to its prior orders); *Meade v. Meade*, 812 F.2d 1473, 1476 (4th Cir. 1987) (noting that a "presumption of continuing and exclusive jurisdiction" in one state court discourages resort to the courts of a second state). Indeed, § 12.4(c) does not include any "non-appealability" language.

Accordingly, we deny the Class's motion to dismiss the appeal based on the contractual language of §§ 4.8 and 12.4(c) of the First Settlement Agreement.

B

The Class also asserts that the portion of the district court's order addressing the most favored nations clause is not a final judgment because it does not resolve all claims for all parties. The Class points to the district court's continuing administration and "oversight of [the tobacco] leaf commitments (to which the [most favored nations clause] relates) and resolution of conflicts thereunder." Moreover, it notes that the RJR portion of the litigation is still not finally resolved.

First, we note that there are no pending issues about whether settling defendants have complied or will comply with tobacco purchase commitments. When such an issue arises, if it does arise at all, it will be addressed by the settlement agreements and by the district court's continuing jurisdiction — a jurisdiction that is analogous to a court's jurisdiction over an injunction. But the issues before us are not of that

character. They relate to the discrete issue of whether the RJR Settlement triggers the adjustments provided for in the First Settlement Agreement. If the district court's order determining that the provisions of the First Settlement Agreement are not triggered by the RJR Settlement is a final order with respect to the monetary payment under the First Settlement Agreement, as the parties seem to agree, it follows that it is also a final order with respect to the district court's determination that the most favored nations clause is not triggered by the RJR Settlement. For, the interpretation and application of the First Settlement Agreement will not be subjected to any further trial or legal analysis by the district court.

This conclusion is apparent because post-settlement orders, of the kind before us, resolve completely the post-settlement issues raised and do not present the same risks for piecemeal appeal that prejudgment orders do. Thus, we agree with the Third Circuit's approach to issues arising in connection with settlement agreements, finding it appropriate "that the requirement of finality be given a 'practical rather than a technical construction.'" *Plymouth Mut. Life Ins. Co. v. Ill. Mid-Continent Life Ins. Co.*, 378 F.2d 389, 391 (3d Cir. 1967) (quoting *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964)). The court there continued, "this is especially so when supplementary post-judgment orders are involved, because the policy against and the probability of avoidable piecemeal review are less likely to be decisive after judgment than before." *Id.* The court concluded that an alleged denial of a bargained-for right in a settlement agreement is immediately appealable as a final order under 28 U.S.C. § 1291. *See id.*

Accordingly, we also reject this ground advanced by the Class to dismiss this appeal.

### III

On the merits, Philip Morris first contends that the RJR Settlement was "reach[ed] . . . on or before the day before the day of trial," and that thereby it was entitled to a payment reduction as provided in the First Settlement Agreement. Acknowledging that the RJR Settlement was actually signed on April 22 and therefore "entered" on the first day of trial, which was scheduled for April 22, Philip Morris argues

that agreement underlying the RJR Settlement was "reached" on April 16, 2004, or at the latest, on April 21, the day before the first day of trial. And because agreement was "reached," as distinct from "entered," at the latest on the day before the first day of trial, its second payment of $65 million is to be reduced as provided in § 2.1.1 of the First Settlement Agreement.

Section 2.1.1(B) provides that RJR shall make its second payment of $65 million "on the day before the first day of trial against any Non-Settling Defendant," but "in the event that Plaintiffs in the Class reach settlements with all Non-Settling Defendants, any Second Settlement Payment, as reduced herein, shall be made by Philip Morris USA 5 days after the last of such settlements receives final approval by the Court." The reduction of this second payment is provided for in § 2.1.1(C), which states in full:

> In the event that Plaintiffs and the Class reach settlements with one or more Non-Settling Manufacturer Defendant(s) [i.e., RJR] *on or before the day before the first day of trial* against any Non-Settling Defendant, the Second Settlement Payment shall be reduced by 50 cents for each dollar actually received pursuant to such settlement exclusive of legal fees and costs. Philip Morris USA shall not receive any refund of its contribution to the First Settlement Payment; the maximum benefit to Philip Morris USA of this subsection will be to reduce the Second Settlement Payment to zero.

(emphasis added). By reason of this provision, Philip Morris asserts that the RJR Settlement triggered a reduction to which it is now entitled.

The district court found as a fact that the parties had not "reached" an agreement until they signed the written document on April 22, and we review the district court's factual finding for clear error. *See Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 541 (4th Cir. 2002).

As a preliminary matter, we conclude that the words "reaches" and "enters into" are not used synonymously in the First Settlement Agreement. Since we treat settlement agreements as contracts, we

must attempt to "give ordinary words their ordinary meanings." *Internet East*, 553 S.E.2d at 87; *see also Harris*, 259 S.E.2d at 241; *Weyerhaeuser Co.*, 127 S.E.2d at 541. The First Settlement Agreement uses the terms in different circumstances. It provides that it "is *entered into* this 15th day of May"; that "this Agreement has been *reached* as a result of the mediation efforts, subject to the preliminary approval of the Court and Final Approval"; and, that "it is in the best interest of the Class to *enter into* this Agreement." (Emphases added). These uses of "enters into" and "reaches" indicate that "enters into" equates with "executes," and "reaches" refers to the process of coming to an agreement, a conclusion that is reenforced by the tenses used with the various terms. This use of the terms, moreover, is consistent with dictionary meanings. Webster, for example, defines "reach" as "to arrive at[,] get up to or as far as[, or] come to" and defines "enter into" as "to make oneself a party to or in." Webster's Third New International Dictionary 757, 1888 (Merriam-Webster, Inc. ed., 1993).

Thus, while we agree with Philip Morris that the terms "reached" and "entered into" have been used differently, *see, e.g.*, *NationsBank of N.C., N.A. v. Am. Doubloon Corp.*, 481 S.E.2d 387, 389 (N.C. Ct. App. 1997) (using the terms distinctly), our review of the evidence in this case nonetheless leads us to conclude that the district court was not clearly erroneous in finding that the RJR Settlement was neither reached nor entered into prior to April 22.

To determine whether a settlement agreement has been reached, we look "to the objectively manifested intentions of the parties." *Moore v. Beaufort County, N.C.*, 936 F.2d 159, 162 (4th Cir. 1991). As the district court noted, details remained to be worked out as of April 16, and "the magnitude of this settlement was such that the sophisticated parties involved would never have reached a final agreement without a signed writing." In addition, the district court made much of the language of the signed RJR Settlement agreement, including the fact that it names April 22 as the effective date and includes a merger clause indicating an intent not to be bound by any previous agreements. While these might not be conclusive indications that the Class and RJR had not come to an agreement before April 22, we cannot conclude on the record before us that the district court's finding was clearly erroneous.

Because we affirm the district court's finding that the RJR Settlement was not reached "on or before the day before the first day of trial," Philip Morris is not on this basis entitled to a return or reduction of its second settlement payment made to the Class.

IV

Referring to different language in the First Settlement Agreement, Philip Morris and Lorillard contend that the RJR Settlement was "entered before the beginning of trial" and that thereby they were entitled, under the most favored nations clause, to a reduction of their tobacco purchase obligations. Noting that when the RJR Settlement was signed, the jury selection process had not yet begun, they argue that jury selection is "the earliest that any court has determined a civil trial to commence." They point in particular to the North Carolina Supreme Court's statement in *Pratt v. Bishop*, 126 S.E.2d 597 (N.C. 1962), defining when a trial commences. That court stated:

> When a trial commences is a difficult question, and the answer may vary according to the statute being construed and according to the circumstances in a particular case. "In general, it has been held that the trial begins when the jury are called into the box for examination as to their qualifications — when the work of impaneling the jury begins — and that the calling of a jury is part of the trial." 53 Am-Jur., Trial, Section 4. . . . Once the case is reached on the calendar and the jury called into the box, "the hurry of a trial" has begun . . . .

*Id.* at 610.

Finding no clear and consistent precedent for when a trial begins, the district court held that the parties' intent, revealed by the overall context of the First Settlement Agreement, generally anticipated a triggering point at some time in the "period between the First Settlement and the starting date of trial." Believing that this intent was a more generalized idea of when the trial began than that urged by Philip Morris and Lorillard, the court held that "a settlement entered into on the day trial was scheduled to start, at the time the case was

called for trial, with a jury venire present, was not entered into before the beginning of trial."

Arguing in support of this interpretation, the Class observes that trial was scheduled to commence at 9:00 a.m. on April 22, 2004, and that the RJR Settlement Agreement was not signed until "approximately 9:30 a.m., well after the scheduled start of trial." Reiterating the district court's analysis, the Class contends that because there is "no uniform definition of when trial begins," the district court was free to conclude, as a matter of legal interpretation, that the beginning of trial simply meant the scheduled start of trial. The Class points to the example where a rule requires that an act be accomplished a specific number of days "before trial," *see, e.g.*, M.D.N.C. R. 40.1, and argues that the rule must be referring to the *scheduled* trial date.

The facts relevant to resolution of this issue are not in dispute. On the day scheduled for trial — April 22, 2004 — the parties to the RJR Settlement signed the written agreement in the courthouse. At the time that the agreement was signed, the jury was in the jury room waiting for trial to begin, and the district judge was in his chambers. When the judge entered the courtroom to begin trial, it was clear that at that time the RJR Agreement had already been signed. As the judge stated, after saying good morning, "I have heard that we have some signed papers." To confirm that, the district judge addressed counsel for both parties, inquiring whether the RJR Agreement had been "signed now," and both counsel responded affirmatively. The jury, which was still outside of the courtroom, was called into the courtroom and advised, "Just about *five minutes ago*," the parties signed a settlement agreement.

With these facts, the question is whether the RJR Settlement was signed "before the beginning of trial," as that term is used in the First Settlement Agreement. This is a question of law that we review *de novo. See Williams v. Prof'l Transp. Inc.*, 294 F.3d 607, 613 (4th Cir. 2002).

The provision of the First Settlement Agreement in question, § 7.1, is included under the heading "Most Favored Nations Clause" and reads:

> In recognition of, among other things, Philip Morris USA's, Lorillard's and B&W's role as the first defendants to settle and their lead roles in initiating and pursuing settlement, Plaintiffs and the Class agree that certain terms of this Agreement shall be no less favorable to Philip Morris USA, Lorillard and B&W than those terms agreed to in future settlements with any Non-Settling Manufacturer Defendant. . . . This Section 7 [most favored nations clause] applies only to settlements *entered before the beginning of trial*, but not to any settlements entered thereafter. Plaintiffs' Co-Lead Counsel presently intend to conclude any trial commenced against a Non-Settling Manufacturer Defendant [RJR].

(Emphasis added). The highlighted phrase is the language at issue here.

Although the beginning of trial is a specific and identifiable moment, that moment may depend on the particular trial that is being conducted and the issue for which the "beginning" must be determined. The beginning of a federal court trial may be different from the beginning of a state court trial; the beginning of a civil trial may be different from the beginning of a criminal trial; the beginning of a jury trial may be different from the beginning of a court trial; and the beginning of a court trial may be different from the beginning of an arbitration. And even within any given type of trial, the "beginning" may be different for each issue for which it must be determined. For example, in the criminal context, jeopardy does not attach for double jeopardy purposes "until a defendant is 'put to trial before the trier of facts.'" *Serfass v. United States*, 420 U.S. 377, 388 (1975) (quoting *United States v. Jorn*, 400 U.S. 470, 479 (1971)). This occurs "when a jury is empaneled and sworn" or, in a nonjury trial, "when the court begins to hear evidence." *Id.*; *see also United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993). For purposes of the Federal Speedy Trial Act, however, we have held that the criminal trial commences with voir dire. *See United States v. A-A-A Elec. Co.*, 788 F.2d 242, 246 (4th Cir. 1986); *see also United States v. Whitaker*, 722 F.2d 1533, 1535 (11th Cir. 1984); *United States v. Manfredi*, 722 F.2d 519, 524 (9th Cir. 1983); *United States v. Howell*, 719 F.2d 1258, 1262 (5th Cir. 1983); *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 376 (2d Cir. 1979). With respect to an offer of

judgment in a civil case under Federal Rule of Civil Procedure 68, which provides that, "at any time more than 10 days *before the trial begins*, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party" (emphasis added), a district court has observed:

> [A]lthough a trial may formally "begin" with the selection of the jury for some purposes, for the purpose of Rule 68, the trial begins when the trial judge calls the proceedings to order and actually commences to hear the case. Where . . . the impanelling of a jury precedes the presentation of evidence and arguments by several weeks or months, this interpretation furthers the policy of Rule 68 by permitting offers of judgment to be made, and perhaps accepted, in the intervening period.

*Greenwood v. Stevenson*, 88 F.R.D. 225, 229 (D.R.I. 1980). Thus, the beginning of trial may be determined not only by the specific type of trial at issue but also by the issue to which that determination might relate.

As a general matter, it cannot be disputed that a "trial" is the judicial proceeding during which the law and the facts are examined to determine the issues between the parties. Accordingly, the beginning of this proceeding must be the first meaningful act in actually conducting the proceeding. And depending on the issue for determining what the first meaningful act is, the beginning of trial may be when the court calls the proceeding to order; or when the court calls the proceeding to order *and* all of the actors are present in the courtroom, including the jury venire; or when the process for the selection of the jury begins; or when the jury is impaneled; or when the opening statements are made; or when the first witness is called. Regardless of which act is the relevant meaningful act, no suggestion has been made that a trial ever begins *before* the judge first enters the courtroom to begin the trial proceedings. *See, e.g.*, *Greenwood*, 88 F.R.D. at 229; *Pratt*, 126 S.E.2d at 610.

Because of the undisputed facts relevant here, we need not fix on any one meaningful act to describe the beginning of trial because the RJR Settlement was indisputably signed even before the district judge

entered the courtroom to begin the trial. We therefore conclude that the RJR Agreement was signed (or "entered") before the beginning of trial. Under the First Settlement Agreement, this means that the most favored nations clause was triggered.

The district court had well-considered pragmatic reasons for reaching its conclusion on this issue, but in doing so it meaningfully rewrote the First Settlement Agreement by interpreting the "beginning of trial" to mean "the day trial was scheduled to start." This was error, and accordingly we reverse this ruling.

V

In summary, we deny the Class's motion to dismiss; we affirm the district court's finding that agreement on the RJR Settlement Agreement was reached on April 22, 2004, and its ruling that therefore the reduction of the second payment under the First Settlement Agreement was not triggered; and we reverse the district court's ruling that the RJR Agreement was not entered before the beginning of trial and that the most favored nations clause therefore was not triggered.

*AFFIRMED IN PART AND REVERSED IN PART*