COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Frank and Clements


WANDA KAY PILKINTON
                                    MEMORANDUM OPINION*
v.    Record No. 2911-01-3              PER CURIAM
                                       APRIL 2, 2002
GARY LEE PILKINTON


            FROM THE CIRCUIT COURT OF ROANOKE COUNTY
                  Diane McQ. Strickland, Judge

            (Barry M. Tatel; Neil E. McNally; Key,
            Tatel & McNally, P.C., on brief), for
            appellant.

            (John Gregory, Jr., on brief), for appellee.


      By decree dated September 28, 2001, the trial court awarded

Gary Lee Pilkinton (husband) a divorce a vinculo matrimonii on the

ground of wife's adultery.  On appeal, Wanda Kay Pilkinton (wife)

contends:  (1) there was insufficient "corroborative evidence [of

residency and domiciliary], independent of the admissions of the

parties, to support the granting of a divorce a vinculo

matrimonii"; and (2) the trial court erred in finding that wife

"had committed adultery."  Upon reviewing the record and the

parties' briefs, we conclude that this appeal is without merit.

Accordingly, we summarily affirm the decision of the trial

court.  Rule 5A:27.

---

      * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

BACKGROUND

On appeal, "we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below . . . . 'The burden is on the party who alleges reversible error to show by the record that reversal is the remedy to which he is entitled.'" Lutes v. Alexander, 14 Va. App. 1075, 1077, 421 S.E.2d 857, 859 (1992) (citation omitted).

So viewed, the evidence proved the parties were married on February 18, 1984. No children were born of the marriage. In February 2001, husband found ten sets of photographs depicting wife posing provocatively in different outfits and in various stages of undress. Two sets were dated July 3, 1997, two sets were dated July 26, 1997, one set was dated September 17, 1997, two sets were dated November 8, 1997, and three sets were dated January 31, 1998. Husband did not recognize any of the lingerie or outfits worn by wife except a white long-sleeve shirt. Moreover, although wife always wore her wedding ring except when she went to bed, the photographs depicting her hands revealed that the ring had been removed. Despite the absence of her wedding ring, the photos depicted wife wearing other rings.

Wife explained that she "approached" Bill Meador because she, like Meador, was interested in photography. She also testified that she "had considered doing some glamour shots" for husband to take with him when he is away on business. Wife testified that "during the process of taking" the photos, the

-

relationship with husband "got worse."  She explained that she did not "want to rekindle any intimacy . . . [and] decided to keep the pictures."

Meador, an unmarried man with whom wife occasionally worked, took all ten sets of photos over a six and one-half month period of time.  The photos were taken in Meador's apartment.  Meador also admitted accompanying wife to various places in the spring and summer of 1997.  He identified two photographs he took of wife in 1997; they depict wife near a pool wearing a bikini bathing suit.

Husband testified that he and wife had had sexual relations only "once or twice in the last five years."  Husband knew nothing about the photographs, and wife never provided copies of any of them to him.  On their February 2001 wedding anniversary, husband found what appears to be a rough draft of a letter written in wife's handwriting to someone named "Mike."  In it, wife wrote the following:

> I can't let you go without letting you know
> what Thurs. night did for me.  You have
> given me an evening that will forever be
> remembered in my heart.  An evening that I
> would like to relive again and again.  There
> is so much more of you that I want a part
> of, more of you that I want to make love to.
> You're a great lover Mike, a hell of a
> kisser (!!) and wow do you know how to
> f _ _ _.

In the letter, wife discussed future dates when "Mike's" baseball team, the Frederick Keys, was scheduled to play in the

area, at which time she hoped to see him.  She asked "Mike" to correspond with her and included her home address and e-mail addresses at work and at home.  In closing she wrote, "Thanks for getting my summer off to a wonderfully hot start."  In her day planner, wife only listed games in which the Frederick team played.  One date noted on the planner was Thursday, June 22, 2000, indicating Frederick played that day.

Husband also found six birthday cards and one general greeting card given to wife.  All seven cards were signed by someone named "Rick."  The caption on the outside of one card reads, "Happy Birthday to the one I love waking up next to!"  Inside, the caption reads, "Also the one I love falling asleep next to, waiting in line next to, sitting on the couch next to . . . ."  After that caption is the following handwritten notation:  "next to you is a good thing!  Rick."  Wife testified that "Rick," the person who signed the six birthday cards, "worked briefly" with her from "March to October."  When asked why Rick gave her so many cards, including the one containing the personal message about falling asleep next to her, wife testified that "Rick" desired to do those things with her.

Husband confronted wife with the evidence and asked her why she had been unfaithful.  He testified that wife admitted having "'numerous affairs.'"  She told husband she had the affairs because husband had not been there for her.

-

Before ruling on the issue, the trial court reviewed case law presented by the parties, "cautiously scrutinized the <u>ore tenus</u> evidence" from the August 14, 2001 hearing, gave "careful consideration to the credibility of the witnesses, including their demeanor on the witness stand," and conducted independent research. By letter dated September 7, 2001, the trial court advised the parties of its holding, namely, that husband proved "by clear, positive, and convincing evidence that the [wife] committed adultery."

<u>ANALYSIS</u>

I.

Quoting from Code § 20-97, wife argues there was insufficient evidence, independent of the admissions of the parties, that either party had "been an actual bona fide resident and domiciliary of this Commonwealth for at least six months preceding the commencement of the suit."

Code § 20-97 provides, in pertinent part:

> No suit for annulling a marriage or for divorce shall be maintainable, unless one of the parties is and has been an actual bona fide resident and domiciliary of this Commonwealth for at least six months preceding the commencement of the suit; nor shall any suit for affirming a marriage be maintainable, unless one of the parties be domiciled in, and is and has been an actual bona fide resident of this Commonwealth at the time of bringing such suit.

Compliance with the provision of the Code's requirement that one of the parties "'is and has been an actual bona fide

-

resident of this State for at least one year [now six months] preceding the commencement of the suit for divorce' is essential to the maintenance of the suit and must be established by evidence introduced in the cause."  Hiles v. Hiles, 164 Va. 131, 139, 178 S.E. 913, 916 (1935) (citing former Code § 5105).

Husband testified at the August 14, 2001 hearing that he and wife had been domiciled in Virginia for at least six months prior to the filing of the suit.  Husband also testified that the letter to "Mike" was written in 1999 or 2000, because she referred to a vacation that occurred in that time period.  In the 1999 or 2000 letter, wife included her home address of "4404 Cordell Dr., Roanoke, VA 24018-2902."

That is the same address contained on documents filed by husband and wife in the trial court on May 31, 2001.  Documents reflecting that address included husband's 2000 W-2 Statement, wife's 2000 W-2 Statement, and a 1099-G Form from the Virginia Employment Commission (VEC) reflecting the total amount of worker's compensation benefits paid to husband in the year 2000.  Moreover, a May 2001 pay statement from husband's employer, EPSG, indicated that Virginia was husband's "RESIDENT STATE" and his "Unemployment State."

Meador testified that he has lived in Roanoke for thirty-one years and first met wife in 1995 or 1996 when she worked at the Roanoke Valley Civic Center.  Wife's 2000 W-2 form showed that wife still works for the same Roanoke employer.

-

The above-referenced evidence satisfactorily established that wife and/or husband was "an actual bona fide resident and domiciliary of this Commonwealth for at least six months preceding the commencement of the suit." Code § 20-97. Accordingly, the trial court properly obtained jurisdiction.

II.

"To establish a charge of adultery the evidence must be clear, positive and convincing. Strongly suspicious circumstances are inadequate." Painter v. Painter, 215 Va. 418, 420, 211 S.E.2d 37, 38 (1975). However, "'while a court's judgment cannot be based upon speculation, conjecture, surmise, or suspicion, adultery does not have to be proven beyond a reasonable doubt.'" Gamer v. Gamer, 16 Va. App. 335, 339, 429 S.E.2d 618, 622 (1993) (citation omitted).

"[I]n determining whether clear and convincing evidence supports a finding of adultery, the Supreme Court and this Court have consistently reviewed the record to determine not only whether the evidence merely established suspicious conduct, but also whether a credible explanation existed for the circumstances." Hughes v. Hughes, 33 Va. App. 141, 150, 531 S.E.2d 645, 649 (2000). "We are not required to believe that which we know to be inherently incredible or contrary to human experience or to usual behavior." Willis v. Commonwealth, 218 Va. 560, 564, 238 S.E.2d 811, 813 (1977) (citation omitted). The fact finder determines whether evidence is unclear,

-

unreasonable, or false. Evidence is incredible if it is "'so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things [such as photographs] as to the explanation and meaning of which reasonable men should not differ.'" Milk Comm. of Virginia v. Safeway Stores, 199 Va. 837, 841, 102 S.E.2d 332, 335 (1958) (quoting Daniels v. Transfer Co., 196 Va. 537, 544, 84 S.E.2d 528, 532 (1954)).

Husband described a five-year period in which the marriage was devoid of intimacy. Wife never told husband she had posed several times in suggestive outfits for "glamour shots" in another man's apartment. The photos, which were purportedly for husband, reveal that wife removed her wedding band but not other rings. In addition to the photographs taken by Meador, husband found a rough copy of a letter to "Mike" discussing making love with him, describing him as a "great lover," advising him there is more of him she "want[s] to make love to" and acknowledging that he "know[s] how to f _ _ _." The letter also contained detailed and accurate personal information that would enable the addressee to contact wife. Finally, husband found seven cards from "Rick," who knew wife only seven months, then left town. One card sent by "Rick" expressed how much he enjoyed waking up next to wife.

The trial court determines issues of credibility and weight of the evidence. The photographs and relationship with Meador,

-

the draft letter to "Mike" and the cards from "Rick," coupled with the wife's incredible explanations, and the reasonable inferences fairly deducible therefrom, describe more than suspicious circumstances.  We have reviewed the evidence and the testimony.  "We cannot escape the conclusion, from the cold print of the record, that [the wife] has been guilty of infidelity.  Common sense and the common experience of men are used as our guide.  'Credulity must not be stretched to the breaking point.'"  Higgins v. Higgins, 205 Va. 324, 328, 136 S.E.2d 793, 796 (1964) (citation omitted).

We conclude that the trial court did not err in finding that the circumstantial evidence proved adultery.  Accordingly, we affirm.

Affirmed.